UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| STACIE A. SHEESLEY, as personal representative of Shane D. Sheesley, deceased; and DEEANN VERMEULEN, as personal representative of Thomas J. Vermeulen, deceased, | ) ) ) ) ) ) ) | CIV.  02-4185-KES<br><br>2006 DSD 6 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | MEMORANDUM<br>OPINION AND ORDER |
| THE CESSNA AIRCRAFT COMPANY; TEXTRON, INC.; TELEDYNE, INC.; TDY HOLDINGS, LLC; TELEDYNE INDUSTRIES, INC.; TDY INDUSTRIES INCORPORATED; TELEDYNE TECHNOLOGIES INCORPORATED; ALLEGHENY TELEDYNE, INC.; ALLEGHENY TECHNOLOGIES INCORPORATED; TELEDYNE CONTINENTAL MOTORS; TELEDYNE CONTINENTAL MOTORS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants and Third-Party Plaintiffs | ) ) ) | |
| and | ) ) | |
| RAM AIRCRAFT CORPORATION  and JOHN DOES 1 THROUGH 10 INCLUSIVE, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| CAPITAL CITY AIR CARRIERS, INC., | ) ) | |
| Third-Party Defendant. | ) | |

GREAT WESTERN BANK, as Personal )    CIV.  03-5011-KES
Representative of the Estate of Robert Bielstein, )
)
       Plaintiff, )
)
  vs. )
)
THE CESSNA AIRCRAFT COMPANY; )
TEXTRON, INC.; )
TELEDYNE, INC.; )
TDY HOLDINGS, LLC; )
TELEDYNE INDUSTRIES, INC.; )
TDY INDUSTRIES INCORPORATED; )
TELEDYNE TECHNOLOGIES INCORPORATED; )
ALLEGHENY TELEDYNE, INC.; )
ALLEGHENY TECHNOLOGIES )
INCORPORATED; )
TELEDYNE CONTINENTAL MOTORS; )
TELEDYNE CONTINENTAL MOTORS, INC., )
)
       Defendants and )
       Third-Party Plaintiffs )
)
  and )
)
RAM AIRCRAFT CORPORATION  and )
JOHN DOES 1 THROUGH 10 INCLUSIVE, )
)
       Defendants, )
)
  and )
)
CAPITAL CITY AIR CARRIERS, INC., )
)
       Third-Party Defendant. )

2

STACIE A. SHEESLEY, as Personal )      CIV.  03-5063-KES
Representative of Shane D. Sheesley, )
deceased; DEEANN VERMEULEN, as )
Personal Representative of Thomas J. )
Vermeulen, deceased; and GREAT )
WESTERN BANK, as Personal )
Representative of the estate of Robert )
Bielstein; )
                              )
        Plaintiffs, )
                              )
  vs. )
                              )
FLIGHTSAFETY INTERNATIONAL, INC., a )
New York corporation, )
                              )
        Defendant.

## TABLE OF CONTENTS

I.     **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    **Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.   **Summary Judgment Standard of Review** . . . . . . . . . . . . . . . . . . . . 10

IV.   **GARA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
     A.    **Cessna** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
          1.    **GARA Trigger Date** . . . . . . . . . . . . . . . . . . . . . 13
          2.    **Knowing Misrepresentation, Concealment, or**
              **Withholding Exception** . . . . . . . . . . . . . . . . . . . . 22
     B.    **Teledyne** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
          1.    **Rolling Provision** . . . . . . . . . . . . . . . . . . . . . . 29
          2.    **Knowing Misrepresentation, Concealment, or**
              **Withholding Exception** . . . . . . . . . . . . . . . . . . . . 30

V.     **Textron's Liability for Torts of Its Subsidiary** . . . . . . . . . . . . 31

VI.    **FlightSafety's Motion to Dismiss for Lack of Personal Jurisdiction** . 32

VII.   **FlightSafety's Negligence** . . . . . . . . . . . . . . . . . . . . . . . . 37
     A.    **Educational Malpractice** . . . . . . . . . . . . . . . . . . . . . . 37
     B.    **Federal Preemption** . . . . . . . . . . . . . . . . . . . . . . . . . 45
          1.    **Field Preemption** . . . . . . . . . . . . . . . . . . . . . . 47
          2.    **Conflict Preemption** . . . . . . . . . . . . . . . . . . . . 55

VIII.  **Wrongful Death Remedies** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60
    **A.**      **Survival Claim** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60
    **B.**      **Punitive Damages** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61
    **C.**      **Shane Sheesley's Stock Price** . . . . . . . . . . . . . . . . . . . . . . . . .  67

IX.  **FlightSafety's Breach of Contract** . . . . . . . . . . . . . . . . . . . . . . . . .  72
    **A.**      **Robert Bielstein** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73
    **B.**      **Shane Sheesley and Thomas Vermeulen** . . . . . . . . . . . . . . . . . .  76

X.  **Plaintiffs' Motions in Limine** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  77
    **A.**      **Under the Influence of Diphenhydramine** . . . . . . . . . . . . . . . . .  77
           **1.**      **Reliability** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  79
           **2.**      **Relevance and Rule 403 Balancing Test** . . . . . . . . . . .  82
    **B.**      **Chronic Sinusitis and Self-Medication** . . . . . . . . . . . . . . . . . . .  85
    **C.**      **Ethanol in Bielstein's Tissue** . . . . . . . . . . . . . . . . . . . . . . . . . .  87
    **D.**      **NTSB Accident Report and NTSB Factual Report** . . . . . . . . . .  87
           **1.**      **NTSB Accident Report** . . . . . . . . . . . . . . . . . . . . . . . . .  88
           **2.**      **NTSB Factual Report** . . . . . . . . . . . . . . . . . . . . . . . . . .  89
                  **a.**      **Toxicology Report** . . . . . . . . . . . . . . . . . . . . . . . .  91
                  **b.**      **Teledyne Motor Engine Tear Down** . . . . . . . . . . . .  92
                  **c.**      **Honeywell's Turbocharger Tear Down Analysis** . .  93
                  **d.**      **NTSB Metallurgy Report of Left Wastegate Elbow**  93
                  **e.**      **Witness Statements** . . . . . . . . . . . . . . . . . . . . . . .  94

XI.  **Motion to Strike Defendants' Designation of Plaintiffs' Experts** . . . .  95

_____

## I.  **Introduction**

This case involves an airplane crash that occurred on August 23,

2000.  Shane Sheesley, Thomas Vermeulen, and Robert Bielstein were all

killed in the crash.  The decedents' estates (collectively referred to as

plaintiffs) filed three separate lawsuits in the United States District Court for

the District of South Dakota.  In these suits, plaintiffs asserted claims

against: The Cessna Aircraft Company and Textron, Inc. (collectively referred

to as Cessna); RAM Aircraft Corporation (RAM Corp); Teledyne, Inc., TDY

Holding, LLC, Teledyne Industries, Inc., TDY Industries Incorporated, Teledyne Technologies Incorporated, Allegheny Teledyne, Inc., Allegheny Technologies Incorporated, Teledyne Continental Motors, and Teledyne Continental Motors, Inc. (collectively referred to as Teledyne); and FlightSafety International, Inc. (FlightSafety).  Additionally, Cessna, Teledyne, and FlightSafety have filed cross-claims against RAM Corp, and third-party claims against Capital City Air Carriers, Inc. (Capital City).

The court has consolidated the three federal cases, and this order rules on the following pending motions:

> Cessna's motion for summary judgment based on GARA (Docket 236);[1]
> Cessna's motion for partial summary judgment (Docket 243);
> Cessna's first motion in limine (Docket 295);
> Teledyne's motion for summary judgment based on GARA (Docket 261);
> Textron, Inc.'s motion for summary judgment (Docket 249);
> Teledyne's motion for summary judgment (Docket 264);
> Teledyne's motion for summary judgment (Docket 267);
> FlightSafety's motion to dismiss for lack of personal jurisdiction (Docket 274);
> FlightSafety's motion for summary judgment (Docket 272);
> FlightSafety's motion to exclude trial testimony of Donald Sommer (Docket 270);
> FlightSafety's motion to strike affidavit of Donald Sommer (Docket 429);
> Plaintiffs' first motion in limine (Docket 242);
> Plaintiffs' second motion in limine (Docket 256);
> Plaintiffs' third motion in limine (Docket 306);

---

[1] For clarity, all docket citations refer to the docket entry in the lead case, Civ. 02-4185-KES, unless otherwise explicitly stated.

Plaintiffs' motion to compel production of documents from Teledyne (Docket 258); and
Plaintiffs' motion to strike affidavit of Mark Marshall (Docket 337).

## II.    Facts

This is merely a brief explanation of the pertinent facts of this case.

Additional relevant facts are noted in the discussion.

In May of 1977, Cessna manufactured a model 340A aircraft, serial

number 340A0308 (referred to as the accident aircraft).  The accident

aircraft was a six-passenger, twin turbocharged engine aircraft with a

pressurized cabin.  Cessna initially sold the accident aircraft to Southaire.

Then, on October 3, 1986, a subsequent owner upgraded both the engines

on the accident aircraft by adding a RAM Series IV upgrade, which increased

the horsepower from 310 hp to 325 hp.  During this upgrade, the wastegate

elbow on the exhaust of the left engine was replaced with a new part.

Although the identity of the manufacturer of the new wastegate elbow is

disputed, the maintenance log book indicates a Cessna manufactured

wastegate elbow, part no. 5654551-4, was used.  Then, in 1996, RAM Corp

performed a RAM Series VI upgrade on both engines that increased the

horsepower from 325 hp to 335 hp.  Action Mechanical, Inc., subsequently

purchased the accident aircraft and owned it when it crashed.

Action Mechanical is a South Dakota corporation that acts as a

plumbing, heating, and cooling contractor.  In 2000, Action Mechanical

6

employed over one hundred people, including Shane Sheesley and Thomas Vermeulen. At that time, Sheesley owned 43.5 percent of the shares in Action Mechanical and was an heir apparent to the CEO of the corporation.

In early 2000, Action Mechanical hired Robert Bielstein as a full-time employee to act as the company's pilot. Bielstein had been a pilot for approximately eight years and possessed a commercial pilot's license. In late June of 2000, Action Mechanical began the process of upgrading the quality of the airplanes it owned. Bielstein, acting at the behest of Action Mechanical, began negotiations to purchase the accident aircraft.

On July 12, 2000, Bielstein signed up for a flight training course at FlightSafety, in Wichita, Kansas. There is a question of fact whether the training course was type specific to a Cessna 340A or whether the course covered all 300/400 Series Cessna aircraft.

On July 14, 2000, Bielstein and Duane Mader traveled to Pierre, South Dakota, and inspected the accident aircraft and its log books. Mader noted several mechanical items that needed attention, and Capital City performed the repairs and the annual inspection of the accident aircraft within the next couple weeks. Capital City signed off on the accident aircraft's annual inspection on July 24, 2000. Action Mechanical finalized its purchase of the accident aircraft on the same day.

On August 7, 2000, Bielstein began flight training at FlightSafety in Wichita, Kansas.  The training lasted five days, with each morning spent in a classroom setting and each afternoon in a flight simulator.  Both FlightSafety's flight training curriculum and its simulator were approved by the Federal Aviation Administration (FAA).  FlightSafety's curriculum included only the emergency procedures contained in the Pilot Operating Handbook issued by Cessna for a 340A.  FlightSafety modified its simulator to try to replicate a Cessna 340A.  Bielstein attended all the required classroom time, obtained nine hours simulator time, scored a 96 percent on his written exam, and completed the flight training course.

In the early evening of August 22, 2000, Bielstein flew the accident aircraft, with Sheesley and Vermeulen as passengers, from Rapid City, South Dakota, to Mission, South Dakota, so that Sheesley and Vermeulen could investigate a reported problem at one of Action Mechanical's job sites. At approximately 2 a.m. on August 23, 2000, the accident aircraft took off from Mission on the return flight.  Bielstein was the pilot in command, and both Sheesley and Vermeulen were passengers on the flight.  The accident aircraft crashed shortly after take off, and Bielstein, Sheesley, and Vermeulen were all killed instantly upon impact.

Following the accident, the National Transportation Safety Board (NTSB) conducted an accident investigation, which culminated in the

creation of an NTSB Accident Report.  The engines and turbochargers were sent to their respective manufacturers for tear down and analysis.  The NTSB investigation indicated a crack in the left wastegate elbow.  An autopsy performed on Bielstein indicated that his tissue contained detectable levels of ethanol and diphenhydramine, an antihistamine with sedative properties.

Plaintiffs contend that the accident was caused by the crack in the left wastegate elbow.  Super hot exhaust gas leaked from this wastegate elbow, and heated a firewall, behind which a fuel line was located.  The heat from the firewall caused the fuel in the fuel line to vaporize, which caused the left engine to stall, ultimately resulting in the crash.  All defendants dispute this characterization, arguing that the accident was caused by pilot error.

As a result of this crash, plaintiffs filed several lawsuits.  Plaintiffs filed a lawsuit in South Dakota state court against Capital City.  Following one week of trial, Capital City and plaintiffs reached a settlement.  Plaintiffs also filed three different lawsuits in the United States District Court for the District of South Dakota.  Following suit in federal court, RAM Corp and plaintiffs also reached a settlement.  The court has consolidated the three federal cases.

### III.    Summary Judgment Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.  Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980).  The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but

must set forth specific facts by affidavits or otherwise showing that genuine issue exists.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

## IV.   GARA

Cessna contends that it is entitled to summary judgment because plaintiffs' claims are barred by the 18-year statute of repose contained in the General Aviation Revitalization Act of 1994 (GARA), Pub. L. No. 103-298, 108 Stat. 1552.  Teledyne similarly moves for summary judgment, arguing that GARA also bars plaintiffs' claims against it.  Plaintiffs oppose the summary judgment motions.

In 1994, Congress adopted GARA to revitalize the general aviation industry.  Wright v. Bond-Air, Ltd., 930 F. Supp. 300, 303 (E.D. Mich. 1996).  In pertinent part, GARA provides:

> (a) In General.--Except as provided in subsection (b), no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as manufacturer if the accident occurred–
>
> > (1) after the applicable limitation period beginning on–
> >
> > > (A) the date of delivery of the aircraft to its first purchaser or lessee, if delivered directly from the manufacturer; or
> > >
> > > (B) the date of first delivery of the aircraft to a person engaged in the business of selling or leasing such aircraft; or

> (2) with respect to any new component, system,
> subassembly, or other part which replaced another
> component system, subassembly, or other part
> originally in, or which was added to, the aircraft,
> and which is alleged to have caused such death,
> injury, or damage, after the applicable limitation
> period beginning on the date of completion of the
> replacement or addition.

GARA, § 2.  Section 3(3) of GARA defines that applicable limitation period as
18 years.  Additionally, GARA includes four statutory exceptions to
enforcement of the statute of repose.  GARA, § 2(b)(1)-(4).  GARA preempts
state law that purports to provide a cause of action outside the applicable
limitation period.  See Wright, 930 F. Supp. at 303.

All parties acknowledge that GARA covers plaintiffs' claims against
Cessna and Teledyne in this case.  Both the crash occurred, and plaintiffs
filed their action, after August 17, 1994, when GARA became effective.  See
GARA, § 4.  Additionally, plaintiffs are asserting civil claims for personal
injury or death arising out of the crash of the accident aircraft.  Further, no
one disputes that the accident aircraft qualified as a general aviation aircraft
as defined in GARA, § 3(c).  Accordingly, the court must determine whether
GARA's statute of repose bars plaintiffs' claims against Cessna or Teledyne.

**A.    Cessna**

Cessna argues that GARA bars plaintiffs' claims for strict liability and negligent design.  Specifically, Cessna argues that the repose period was triggered on May 5, 1977, when Cessna first delivered the accident aircraft to its first purchaser, and that the repose period expired on May 5, 1995.  Plaintiffs dispute this conclusion, arguing that the repose period restarted in 1986, when the left engine wastegate elbow was replaced during the RAM Series IV upgrade.  Alternatively, plaintiffs argue that the "knowing misrepresentation, concealment, or withholding exception" contained in GARA § 2(b)(1) applies.

**1.    GARA Trigger Date**

GARA provides two alternative trigger dates that start the 18-year repose period.  The first trigger date occurs when the manufacturer delivers the aircraft to the first purchaser or lessee or to a person engaged in the business of selling or leasing the aircraft.  GARA, § 2(a)(1)(A)-(B).  This, however, is subject to GARA's rolling trigger date.  "Under GARA § 2(a)(2), a new eighteen year period begins when a new part is added to an aircraft if this part is alleged to have caused an accident."  Robinson v. Hartzell Propeller Inc., 326 F. Supp. 2d 631, 660 (E.D. Pa. 2004).  The rolling provision only restarts the repose period for claims against the manufacturer of the new part that actually caused the crash.  See Hinkle v.

13

Cessna Aircraft Co., No. 247099, 2004 WL 2413768, at *8 (Mich. Ct. App.

Oct. 28, 2004); see also Hiser v. Bell Helicopter Textron Inc., 4 Cal. Rtpr. 3d

249, 257 (Cal. Ct. App. 2003) (holding that replacement of a single part in

the fuel system does not restart the repose period for the entire fuel system).

> Since almost every major component of the aircraft will be
> replaced over its lifetime, the 'rolling' aspect of the statute of
> repose was intended to provide that victims and their families
> would have recourse against the manufacturer of the new
> component part in the event of a defect in the new part causing
> an accident.

Burroughs v. Precision Airmotive Corp., 93 Cal. Rptr. 2d 124, 131-32 (Cal.

Ct. App. 2000).

Plaintiffs contend that the repose period rolled on October 3, 1986,

when the accident aircraft's left wastegate elbow was replaced with a new

wastegate elbow.  Plaintiffs presented evidence that on October 3, 1986, the

left engine of the accident aircraft was modified by the addition of a RAM

Series IV engine upgrade.  (Docket 329-10, at ¶ 4).  During the upgrade, the

original wastegate elbow was replaced with a new wastegate elbow.  (Docket

329-10, at ¶¶ 5, 7).  The replacement of the wastegate elbow restarts the 18-

year limitation period for defects in the new wastegate elbow.  See Hiser, 4

Cal. Rtpr. 3d at 255.

Cessna argues that the rolling repose provision does not apply

because it did not manufacture the component part that caused the

accident.  Specifically, Cessna argues that RAM Corp, not Cessna,

manufactured the Ram Series IV upgrade used in this case.  Cessna

correctly posits that "the replacement parts provision [applies] only to the

entity that manufactured the replacement part."  Campbell v. Parker-

Hannifin Corp., 82 Cal. Rptr. 2d 202, 209 (Cal. Ct. App. 1999).

Nevertheless, plaintiffs present evidence suggesting that the defective

wastegate elbow was in fact manufactured by Cessna.  Specifically, the

maintenance log book indicates that a Cessna-manufactured wastegate

elbow, part no. 5654551-4, was installed in the left engine during the RAM

Series IV upgrade performed in October of 1986.  (Docket 329-10, at ¶ 4).

Additionally, plaintiffs present evidence that RAM was "buying and installing

new Cessna parts at that time." (Docket 329-45, at 4).  This evidence,

viewed in the light most favorable to plaintiffs, creates a genuine issue of

material fact as to whether Cessna manufactured the wastegate elbow.  See

Vette Co., 612 F.2d at 1077.

Even still, section 2(a)(2)'s rolling repose provision only applies in this

case if the new wastegate valve caused the crash.  See Hiser, 4 Cal. Rtpr. 3d

at 255; see also GARA, § 2(a)(2).  Plaintiffs have met their burden by

presenting evidence indicating that, at a minimum, a question of material

fact exists as to whether a defective, left wastegate elbow caused the crash.

(Docket 329-9, at ¶3).  Accordingly, the repose period for asserting a claim

against Cessna based upon the left wastegate elbow rolled on October 3,

15

1996.  The 18-year repose period expired on October 3, 2004.  And, plaintiffs' crash, which occurred on August 23, 2000, was within the repose period.  Accordingly, GARA does not bar plaintiffs' claims against Cessna, which allegedly manufactured the defective wastegate elbow.

Plaintiffs also argue that even if Cessna did not physically manufacture the wastegate elbow, federal regulations deem Cessna the manufacturer of the wastegate elbow in this case because Cessna owned the type certificate[2] for the exhaust system involving the elbow.  Essentially, plaintiffs argue that the holder of a type certificate is always considered the manufacturer of a defective part for purposes of the rolling provision in GARA.

Plaintiffs' argument relies on Burroughs, 93 Cal. Rptr. 2d 124, and Mason v. Schweizer Aircraft Corp., 653 N.W.2d 543 (Iowa 2002).  In Burroughs, a pilot and his passengers brought suit against an airplane parts manufacturer when the carburetor failed, causing a crash.  The manufacturer invoked GARA, contending that both the plane and the defective carburetor were over 18 years old.  Plaintiffs argued that GARA did not apply because it only protects manufacturers of defective products, and

---

[2]  Pursuant to Federal Aviation Regulations, the FAA issues a type certificate to the manufacturer of an approved design.  See 14 C.F.R. §§ 21.24, 21.31, 21.41.  Among other duties, the holder of the type certificate has an affirmative obligation to report any failures, defects, or malfunctions of parts covered by its type certificate to the FAA.  See 14 C.F.R. § 21.3.

the defendant did not actually manufacture the defective carburetor in this case.  The court noted that the defendant was a current producer of aircraft parts, including carburetors, and that the defendant had purchased the carburetor product line from the original manufacturer.  Based thereon, the court concluded that the new manufacturer stepped into the shoes of the original manufacturer, and thus, GARA barred the claim.  The court reached this conclusion because it furthered GARA's goal of revitalizing the general aviation industry by terminating the long tail of liability for aircraft manufacturers:

> The central objective of GARA would be materially undermined if its protection did not apply to a successor to the manufacturer who, as part of its ongoing business, acquired a product line long after the particular product had been discontinued and years after the statute of repose had run as to the original manufacturer.

Burroughs, 93 Cal. Rptr. 2d at 132.

Mason, 653 N.W.2d 543, involves a similar factual scenario.  The pilot of a helicopter brought suit against a helicopter manufacturer when the pilot's helicopter crashed.  The defendant did not physically manufacture the accident helicopter.  The defendant did, however, purchase a product line from the original manufacturer that included the model of the accident helicopter.   The defendant also produced parts for the accident helicopter's model, owned the type certificate for the model of the accident helicopter, and produced similar models of helicopters.  Similar to Burroughs, the Iowa

17

Supreme Court held that the defendant stepped in the shoes of the original manufacturer, and thus, was entitled to GARA protection.  <u>Mason</u>, 653 N.W.2d at 549.  Like the court in <u>Mason</u>, the Iowa Supreme Court reached this conclusion because it furthered GARA's underlying purpose by limiting manufacturer's liability.  <u>See</u> <u>id.</u> at 548-49.

Neither <u>Burroughs</u> nor <u>Mason</u> apply to this case, however, because no evidence suggests that Cessna is the successor to the actual manufacturer of the wastegate elbow (assuming Cessna itself did not manufacture the part).  Further, using Cessna's mere ownership of the type certificate to trigger GARA's rolling provision disregards the reasoning of <u>Burroughs</u> and <u>Mason</u> and contravenes GARA's core purpose.  Both <u>Burroughs</u> and <u>Mason</u> adopted constructions of GARA that limited manufacturer liability. Plaintiffs' argument, however, purports to expand manufacturer liability. This is illustrated by plaintiffs' contention that the wastegate elbow is covered by both Cessna's and Teledyne's type certificates, and thus, both are deemed manufacturers for the purposes of GARA's rolling provision.  If adopted, this construction would thwart Congress's intention of limiting the tail of liability applicable to the manufacturers of general aviation aircraft. The court finds that Congress meant what it said—the provision rolls the repose period for a claim against the manufacturer of a defective part.  If Congress intended to roll the provision for the holder of the type certificate

18

covering the part, it could have said so because Congress understood the type certificate application process when it adopted GARA. Cf. GARA, § 2(b)(1) (stating that the misrepresentation exception applies to statements by manufacturers to the FAA during an application for a type certificate).

Cessna raises one additional argument that GARA bars plaintiffs' claims. Specifically, Cessna argues that plaintiffs' substantive claims assert that the wastegate elbow was negligently or defectively designed. Further, Cessna argues that the design of the wastegate elbow was more than 18 years old when the crash occurred, and thus, GARA bars a claim for negligent or defective design irrespective of when the actual wastegate elbow that caused the crash was replaced.

Cessna's argument relies on LaHaye v. Galvin Flying Serv., Inc., 144 Fed. Appx. 631 (2005), cert. denied, No. 05-880, 2006 WL 118038 (Mar. 20, 2006), an unpublished opinion from the Ninth Circuit. In LaHaye, the plaintiff asserted a claim for defective design of a helicopter trim actuator. The Ninth Circuit held that GARA barred the claim. The court refused to apply the rolling provision despite the recent overhaul of the trim actuator, because the rolling provision only applies when "there has been a substantive alteration to the part that was alleged to have proximately caused the accident." Id. at 633.

The court finds LaHaye unpersuasive.  The court in LaHaye provided no rationale or reasoning to support its conclusory finding that GARA's rolling provision requires a substantive design alteration within the 18 years preceding the accident.  The sole support offered is a citation to Caldwell v. Enstrom Helicopter Corp., 230 F.3d 1155 (9th Cir. 2000).  The LaHaye court's reliance on Caldwell, however, is misplaced because Caldwell presented a different issue.

In Caldwell, the Ninth Circuit held that an aircraft owner's manual can constitute a new part for purposes of GARA's rolling repose provision. Id. at 1157 & n.3.  Accordingly, a revision of the aircraft owner's manual acts as the replacement of the part with a new part, thereby triggering the rolling provision.  See id.  The court stated that the rolling provision only applies, however, if the revised portion of the manual caused the accident. See id. at 1158.

The court in Caldwell merely defined "new part" narrowly, refusing to permit revision of one part of the owner's manual to qualify the entire owner's manual as a new part.  See id. at 1158 ("Just as the installation of a new rotor blade does not start the 18-year period of repose anew for the purposes of an action for damages due to a faulty fuel system, a revision to any part of the manual except that which describes the fuel system would be irrelevant here.").  This is akin to other cases holding that replacement of

20

one component part does not roll the repose period for the entire system of
which the component part is a subpart.  See Hinkle, 2004 WL 2413768, at
*8; Hiser, 4 Cal. Rptr. 3d at 256-57.  This proposition, however, does not
require a substantive change in the design of the new part to roll the repose
period.  Rather, Caldwell stands for the proposition that the replacement of
the wastegate elbow in this case did not roll the repose period for the
exhaust system as a whole.

The court further rejects Cessna's argument because the plain
language of GARA's rolling provision permits plaintiffs to assert a claim
against the manufacturer of a replacement part so long as the crash occurs
within 18 years of the replacement of the part.  See GARA, 2(a).  If Congress
wanted to further limit application of GARA's rolling provision to certain
substantive theories, such as defective design cases, it would have added
language to that effect.  Indeed, in a different part of the statute, Congress
expressly limited application of GARA to certain substantive theories of
liability by limiting application to claims asserted against manufacturers
acting in their manufacturing capacity.  See GARA, § 2(a).  This suggests
that Congress recognized its ability and chose, when appropriate, to
distinguish between substantive theories.  Congress did not, however, limit
claims for defective design.  And, this court refuses to judicially amend

21

GARA to impose the substantive design change requirement sought by Cessna.

In summary, the accident aircraft in this case is subject to GARA. The replacement of the wastegate elbow, however, rolled the repose period. The crash occurred within 18 years of this rolling, and thus, GARA does not bar plaintiffs' claims against Cessna.

### 2. Knowing Misrepresentation, Concealment, or Withholding Exception

Alternatively, plaintiffs argue that GARA does not bar their claims against Cessna because a statutory exception to GARA's enforcement applies in this case. Specifically, plaintiffs argue for application of GARA, § 2(b)(1):

> [The statute of repose does not apply] if the claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer with respect to a type certificate or airworthiness certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration, required information that is material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, that is causally related to the harm which the claimant allegedly suffered.

This exception has three elements: "(1) knowing misrepresentation or concealment, or withholding; (2) of required information that is material and relevant; (3) that is causally related to the harm [plaintiffs] suffered."

22

Robinson, 326 F. Supp. 2d at 647.  Mere negligent design is insufficient

because "[t]he plaintiff must offer evidence that the defendant knowingly

misrepresented or concealed or withheld this defect in communications with

the FAA."  Id.  Regardless of whether it is based upon a misrepresentation,

concealment, or withholding of information, the exception requires an

intentional act by the defendant.  Hinkle, 2004 WL 2413768, at *12 (holding

that knowingly modifies concealed and withheld as well as misrepresented).

       The "misrepresentation, concealment, or withholding exception" does

not apply in this case because plaintiffs have presented no evidence

indicating that Cessna misrepresented, concealed, or withheld information

from the FAA.  Plaintiffs fail to point to any specific false statements by

Cessna to the FAA.  See Robinson, 326 F. Supp. 2d at 653 (applying the

misrepresentation exception when "plaintiffs have pointed to affirmative

misstatements in a report submitted to the FAA").  Instead, plaintiffs provide

a detailed history of the problems associated with the exhaust systems

contained in Cessna turbocharged twin engine general aviation aircraft.

This history details twenty-five plus years of problems caused by exhaust

leaks, and both Cessna's and the FAA's response to those problems.

Plaintiffs focus particularly on the fact that Cessna chose to solve these

problems by imposing more frequent inspections of the exhaust system

rather than redesigning the system.  Although probative on whether

Cessna's design was defective, this evidence does not indicate that Cessna made a misrepresentation to the FAA.  See Rickert v. Mitsubishi Heavy Indus., Ltd., 923 F. Supp. 1453, 1461 (D. Wyo. 1996) (Rickert I) (stating evidence did not indicate a knowing misrepresentation or concealment even though it suggested that the defendant's design was "obstinant, short-sighted, negligent, and perhaps reckless"), rev' d on other grounds by Rickert v. Mitsubishi Heavy Indus., Ltd., 929 F. Supp. 380 (D. Wyo. 1996) (Rickert II).

Additionally, plaintiffs have failed to present evidence indicating that Cessna concealed or withheld information from the FAA.  It is undisputed that Cessna owns the type certificate governing the accident aircraft and its exhaust system, and thus, federal aviation regulations impose an affirmative duty upon Cessna to "report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (c) of this section."  14 C.F.R. § 21.3; see also Robinson, 326 F. Supp. 2d at 657.  Furthermore, the FAA issued Cessna a Delegation Option Authorization (DOA)[3] governing the design of the accident aircraft.  As such, Cessna "had a responsibility not

---

[3] By issuing a DOA, the FAA delegates its certification responsibilities to a private, qualified individual, such as Cessna in this case.  See 49 U.S.C. § 44702(d); see also United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 807, 104 S. Ct. 2755, 2761, 81 L. Ed. 2d 660 (1984).

only to report [exhaust system] failures but to resolve problems with the

[exhaust system]." <u>Robinson</u>, 326 F. Supp. 2d at 657.

Nevertheless, no evidence suggests that Cessna failed to comply with

this duty.  In essence, plaintiffs argue that Cessna knew that its exhaust

design was defective, but that Cessna intentionally concealed or withheld

this information from the FAA when Cessna recommended solving exhaust

leak problems by requiring more frequent exhaust system inspections.

Plaintiffs rely heavily on the multi-engine service letter[4] No. ME70-20, that

Cessna issued on May 22, 1970.  In this letter, Cessna stated:

> A thorough check of the exhaust system is an important part of
> any power plant inspection.  This is more important on a
> turbocharged engine . . . since . . .
>
> > 1.   High turbocharger operating temperatures
> >      and slow heat dissipation result in faster heat
> >      deterioration and aging of exhaust system
> >      components.
> >
> > 2.   Turbocharger systems operate at higher back
> >      pressure in the exhaust system causing
> >      minor failures to progress more rapidly.

(Docket 329-13) (second omission in original).  Based on this letter, plaintiffs

contend that Cessna knew about the defective exhaust since May of 1970.

---

[4] Service Letter No. ME70-20 is one of the service bulletins issued by
Cessna to provide "the aircraft operator with information on inspections,
product replacement or changes to the type certificated product."  (Docket 383,
at ¶ 3b).  From the FAA's perspective, service recommendations in the service
bulletins are not mandatory on the aircraft operator.  <u>Id.</u>

Although this letter creates an inference that Cessna was aware of the additional exhaust complications associated with Cessna turbocharged twin engine aircraft by May of 1970, plaintiffs have not provided any evidence indicating that Cessna concealed or withheld this information from the FAA. Cessna explicitly included this information in Service Letter ME70-20, which was issued to all aircraft operators.  Further, the record establishes that the FAA was aware of the contents of Service Letter ME70-20 when it issued Airworthiness Directive[5] (AD) 72-10-5.  (Docket 380-2).  AD 72-10-5 specifically cites and relies on Service Letter ME70-20.

All the evidence establishes that Cessna consistently worked in conjunction with the FAA to rectify the exhaust system problems in Cessna turbocharged twin engine aircraft.  Between 1970 and 1975, Cessna issued five service letters acknowledging problems with the exhaust and requiring increased exhaust inspections.  (Docket 329-14, 329-15).  In 1972, 1975, 1976, and at least four additional times, the FAA issued or revised existing ADs in light of continued exhaust problems.  (Docket 329-1, at 10, 329-17, 329-18).  In 1986, the NTSB issued a Safety Recommendation, requesting that the FAA further revise AD 75-23-08, in light of two crashes caused by

---

[5] An AD is a legally enforceable rule issued by the FAA in response to finding of an unsafe condition in a product, which likely exists in other products.  14 C.F.R. §§ 39.3, 39.5.  The operators of aircraft are required to comply with the service requirements contained in an AD.  14 C.F.R. §§  39.7-39.11.

exhaust system problems.  Once again, Cessna worked directly with the FAA, conducting a study to determine whether a mandatory replacement date for specific exhaust parts was warranted.  (Docket 329-24).  Following the study, Cessna recommended against a mandatory, periodic replacement because it "is unenforceable, encourages operators to use alternate sources or uncontrolled rework techniques and leads to questionable documentation."  (Docket 329-29).  Finally, in 1997, the FAA determined that design changes, not increased inspections, were necessary to prevent crashes caused by exhaust problems.  Again, the FAA worked directly with Cessna on this matter.  And, although Cessna disagreed on whether the exhaust problems should be solved through a design change rather than inspections, nothing indicates that Cessna withheld or concealed information in this process.  (Docket 329-35).

The court finds that plaintiffs have failed to establish a genuine issue of material fact on whether Cessna concealed or withheld information. Plaintiffs have not identified any information that was actually withheld; rather they point to a public service letter, the contents of which the FAA was aware.  See Rickert II, 929 F. Supp. at 382; Butler v. Bell Helicopter Textron, Inc., 135 Cal. Rptr. 2d 762, 771-73 (Cal. Ct. App. 2003).  Further, the extensive review of the exhaust system problems by the FAA and the NTSB, as well as Cessna's direct involvement in discussion of the exhaust

27

system problems, thwarts plaintiffs' argument that Cessna withheld or concealed information.  See Campbell, 82 Cal. Rptr. 2d at 210 ("The detailed review by the NTSB and recommendations made to the FAA for further study tend to defeat, not support, claims of misrepresentation and concealment by Cessna.").  At most, plaintiffs have indicated that Cessna negligently disagreed with the FAA on how to solve the exhaust system failure problem.  This, however, is not sufficient to satisfy the "knowing misrepresentation, concealment, or withholding exception."  See Rickert I, 923 F. Supp. at 1461-62.  Still, as discussed above, Cessna's summary judgment motion based upon GARA (Docket 236) is denied because of the rolling GARA provision.[6]

**B.    Teledyne**

Teledyne also moves for summary judgment (Docket 261) based upon GARA.  Teledyne manufactured the two engines on the accident aircraft.  The right engine was delivered to its first customer in 1975.  (Docket 263, 356).  The left engine was delivered to its first customer in 1981.  (Docket 263, 356).  Teledyne argues that both engines were more than 18 years old

---

[6] Plaintiffs move to strike the affidavit of Charles Morin, P.E., (Docket 404-1)  and to strike the affidavit of Mark Marshall (Docket 337), from the record before the court on this summary judgment.  Because summary judgment is denied, plaintiffs' motions are denied as moot.

when the crash occurred on August 23, 2000, and thus, GARA bars plaintiffs' claims.

Plaintiffs admit the delivery date of the engines in question but argue that GARA does not bar their claims. First, plaintiffs argue that the 18-year repose period rolled in 1986. Alternatively, plaintiffs argue that the "knowing misrepresentation, concealment, or withholding exception" applies.

### 1.    Rolling Provision

Plaintiffs argue that replacement of the wastegate elbow started anew the repose period governing their claims against Teledyne. This argument lacks merit, however, because Teledyne did not manufacture the wastegate elbow. See Campbell, 82 Cal. Rptr. 2d at 209. Teledyne only manufactured the engines, and even if the wastegate elbow is considered a component part of the engine, this does not roll the repose period applicable to the entire engine. See Hinkle, 2004 WL 2413768, at *8; Hiser, 4 Cal. Rptr. 3d at 256-57.

Recognizing that Teledyne did not physically manufacture the wastegate elbow, plaintiffs argue that Teledyne is still a "manufacturer" of the wastegate elbow because Teledyne allegedly held a type certificate governing the left wastegate elbow. Plaintiffs asserted this identical argument above against Cessna, and the court rejected it. The court rejects

the argument against Teledyne for the same reasons.  GARA's rolling

provision does not apply because Teledyne did not physically manufacture

the left wastegate elbow.

### 2.    Knowing Misrepresentation, Concealment, or Withholding Exception

Plaintiffs also argue that GARA does not bar their claim because

Teledyne knowingly misrepresented, concealed, or withheld information that

it was obligated to disclose to the FAA.  Plaintiffs incorporate by reference

the facts that plaintiffs' claim established Cessna's knowing

misrepresentation, concealment, or withholding of information.  And, as

above, the court finds that plaintiffs have failed to prove that Teledyne

misrepresented, concealed, or withheld information from the FAA.

Accordingly, the court finds that GARA applies and bars plaintiffs' claims

against Teledyne.  Teledyne's motion for summary judgment (Docket 261) is

granted.

In addition, because the court grants Teledyne summary judgment

based upon GARA, it does not reach Teledyne's other motions for summary

judgment.  Instead, Teledyne's motion for summary judgment (Docket 264)

and motion for summary judgment (Docket 267) are both denied as moot.

Further, plaintiffs' motion to compel document production (Docket 258) from Teledyne is also denied as moot.[7]

## V.   Textron's Liability for Torts of Its Subsidiary

Plaintiffs assert claims against Textron, Inc., the wholly owned parent corporation of Cessna Aircraft Company, which manufactured the accident aircraft and allegedly manufactured the left wastegate elbow.  Textron seeks summary judgment (Docket 249), arguing that it did not commit a tortious act, and that it is not liable for the tortious acts of Cessna Aircraft Company because it is a separate legal entity.  Plaintiffs have neither responded nor disputed this argument.  Additionally, plaintiffs have not controverted the facts contained in Textron's statement of material facts, and thus, plaintiffs are deemed to have admitted all facts contained therein.  See D.S.D. LR 56.1(D).

As a general rule, a parent corporation is not liable for the tortious acts of its separate, subsidiary corporation.  See Bollwerk v. Susquehanna Corp., 811 F. Supp. 472, 477 (D.S.D. 1993).  In order to hold the parent corporation liable, the plaintiff must pierce the corporate veil of the

---

[7] In any event, Teledyne has apparently complied with plaintiffs' discovery request.  Following plaintiffs' motion to compel, Teledyne filed a response brief arguing that it had since fully complied with plaintiffs' document request.  Teledyne also included a copy of its supplemental responses to plaintiffs' request for document production.  Plaintiffs have never filed a reply brief nor refuted Teledyne's contention that it fully complied with plaintiffs' discovery requests.

subsidiary corporation.  See id.   Under South Dakota law, piercing the

corporate veil is only appropriate when "continued recognition of a

corporation as a separate legal entity would 'produce injustices and

inequitable consequences.'"  Baatz v. Arrow Bar, 452 N.W.2d 138, 141 (S.D.

1990) (quoting Farmers Feed & Seed, Inc. v. Magnum Enter., Inc., 344

N.W.2d 699, 701 (S.D. 1984)).  Six factors indicate when piercing the

corporate veil is appropriate.  See id.

　　　Here, no evidence indicates that Textron committed a tort against

plaintiffs.  (Docket 251, at ¶ 11)  Additionally, Textron is not liable for the

alleged tortious acts of Cessna Aircraft Company because Textron is a

separate, legally distinct corporation.  (Docket 251, at ¶¶ 7-10)  Further, no

evidence supports piercing the corporate veil.  Accordingly, Textron's motion

for summary judgment (Docket 249) is granted.

## VI.　FlightSafety's Motion to Dismiss for Lack of Personal Jurisdiction

　　　FlightSafety moves for dismissal of plaintiffs' claims pursuant to Fed.

R. Civ. P. 12(b)(2), contending that the court lacks personal jurisdiction over

it.  Plaintiffs argue that FlightSafety has waived its objection to personal

jurisdiction, or that the court possesses personal jurisdiction over

FlightSafety.

　　　As a preliminary matter, the court must determine whether

FlightSafety has preserved its objection to personal jurisdiction in this case.

Lack of personal jurisdiction is a personal defense that is waived unless timely asserted.  See Carlson v. Hyundai Motor Co., 164 F.3d 1160, 1163 (8th Cir. 1999).  In order to preserve an objection to jurisdiction over the person under the Federal Rules of Civil Procedure, defendants must either assert the defense in their answer or in a pre-answer Rule 12 motion.  See Fed. R. Civ. P. 12(h)(1).  Failure to include an objection to personal jurisdiction in either the defendant's answer or a previous rule 12 motion waives the underlying defense.  See id.; see also Yeldell v. Tutt, 913 F.2d 533, 539 (8th Cir. 1990).

Defendants' compliance with Rule 12(h)(1) by including the personal jurisdiction objection in their answer does not, however, always preserve the defense, because the "'rule sets only the outer limits of waiver; it does not preclude waiver by implication.'" Yeldell, 913 F.2d at 539 (quoting Marquest Medical Prods., Inc. v. EMDE Corp., 496 F. Supp. 1242, 1245 n.1 (D. Colo. 1980)).  "Thus, the personal jurisdiction defense may also be 'lost by failure to assert it seasonably, by formal submission in a cause, or by submission through conduct.'" Network Prof'ls, Inc. v. Network Int'l Ltd., 146 F.R.D. 179, 182 (D. Minn. 1993) (quoting Yeldell, 913 F.2d at 539).  Defendant's conduct must "reflect a continuing objection to the power of the court to act over the defendant's person." Alger v. Hayes, 452 F.2d 841, 844 (8th Cir. 1972).

33

FlightSafety argues that it preserved its objection to personal jurisdiction by including the defense in its answer.  FlightSafety explicitly asserted lack of personal jurisdiction as an affirmative defense in its answer. (Civ. No. 03-5063-KES, Docket 3).  FlightSafety also asserted the defense in its amended answer.  (Docket 201).  FlightSafety thus technically complied with the requirements of Rule 12(h)(1).

Mere compliance with Rule 12(h) does not preserve FlightSafety's personal jurisdiction objection, however.  See Yeldell, 913 F.2d at 539.  In Yeldell, the defendants' answer specifically asserted lack of personal jurisdiction as an affirmative defense.  Nevertheless, the defendants engaged in discovery and motion practice, and even completed a five-day trial without pursuing their personal jurisdiction objection.  Then, on appeal, the defendants attempted to assert the defense.  The Eighth Circuit held that defendants waived the defense despite explicitly stating it in their answer, because "[w]hile [defendants] literally complied with Rule 12(h) . . . they did not comply with the spirit of the rule, which is 'to expedite and simplify proceedings in the Federal Courts.'"  Id. at 539 (quoting Charles Alan Wright & Arthur R. Miller, 5A Federal Practice and Procedure § 1342, at 162 (2d ed. 1990)).

Other courts have similarly found that defendants waived their objection to personal jurisdiction by actively participating in the pending

34

litigation.  For instance, in <u>Cont'l Bank, N.A. v. Meyer</u>, 10 F.3d 1293 (7th Cir. 1993), the Seventh Circuit held that the defendants waived their personal jurisdiction objections despite affirmatively pleading lack of personal jurisdiction in their answer.  The court noted that "the defendants fully participated in litigation on the merits for over two-and-a-half years without actively contesting personal jurisdiction.  They participated in lengthy discovery, filed various motions  and opposed a number of motions . . . ." <u>Id.</u> at 1297.  Similarly, in <u>Network Prof'ls, Inc.</u>, 146 F.R.D. at 184, the district court for the District of Minnesota held defendants' conduct waived their objection to personal jurisdiction because defendants waited eight months after the litigation commenced to assert their personal jurisdiction defense, participated in discovery, and responded to plaintiffs' motion for a preliminary injunction.

Here, FlightSafety exhibited similar conduct waiving its personal jurisdiction objection.  Plaintiffs filed their complaint against FlightSafety on July 7, 2003.  FlightSafety filed its initial answer, which affirmatively asserted lack of personal jurisdiction, on July 24, 2003.  Nevertheless, FlightSafety did not pursue that defense until it filed a motion to dismiss for lack of personal jurisdiction on October 28, 2005.  In the meantime, FlightSafety participated in both discovery and motions practice.  For instance, FlightSafety filed the following documents: (1) joint motion to

35

extend on March 29, 2004; (2) notice of deposition on June 7, 2004; (3) stipulation to be bound by protective order on June 17, 2004; (4) notice of deposition on August 4, 2004; (5) motion to extend expert discovery on September 14, 2004; (6) notice of deposition on October 18, 2004; (7) motion to consolidate case with related cases on March 3, 2005; (8) motion to extend on May 11, 2005; (9) amended answer and third-party complaint on June 22, 2005; and (10) response to motion to compel discovery on September 6, 2005.  Additionally, plaintiffs allege (and FlightSafety does not deny) that FlightSafety actively engaged in substantial written discovery and attended over thirty depositions.  Furthermore, nearly two years after filing its initial answer, FlightSafety amended its answer and sought affirmative relief from the court by filing a third-party complaint against RAM Corp and Capital City (Docket 201).  This conduct "does not reflect a continuing objection to the power of the court to act over [FlightSafety.]" Alger, 452 F.2d at 844.  Accordingly, the court finds that FlightSafety waived its objection to personal jurisdiction and FlightSafety's motion to dismiss (Docket 272) is denied.[8]

---

[8] The court refrains from reaching the constitutional issue implicated by determining whether exercise of personal jurisdiction over FlightSafety violates due process.  See United States v. Allen, 406 F.3d 940, 946 (8th Cir. 2005) (stating courts should avoid deciding unnecessary constitutional issues).

## VII.   FlightSafety's Negligence

FlightSafety moves for summary judgment on plaintiffs' negligence claim.  FlightSafety argues that it is entitled to judgment as a matter of law because plaintiffs' negligence claim is based upon educational malpractice. Alternatively, FlightSafety argues that the Federal Aviation Act (Act) and its corresponding regulations preempt plaintiffs' negligence claim.

### A.   Educational Malpractice

Plaintiffs have asserted a negligence claim, contending that FlightSafety negligently trained Bielstein by failing to include emergency procedures relating to exhaust system failures in its curriculum and by using a flight simulator that failed to accurately replicate a Cessna 340A. FlightSafety argues that plaintiffs are asserting an educational malpractice claim, which is not a cognizable cause of action under South Dakota law. Plaintiffs respond by arguing that this is not an educational malpractice claim.

Negligence liability requires the breach of a duty which proximately caused harm to the plaintiff.  Unless a statutorily created duty applies, the court must ascertain whether the defendant had a duty to the plaintiff.  See Fisher v. Kahler, 641 N.W.2d 122, 125 (S.D. 2002).  In essence, FlightSafety is arguing that public policy prohibits imposing a duty on it to train Bielstein in a reasonable manner.

37

The South Dakota Supreme Court has not considered whether a claim for educational malpractice is cognizable under South Dakota common law. Nor has it considered the scope of claims falling under the so-called educational malpractice umbrella.  Accordingly, this court must predict whether the South Dakota Supreme Court would find that FlightSafety's negligence claims sound in educational malpractice, and if so, whether South Dakota law recognizes the tort of educational malpractice.  See Lindsay Mfg. Co. v. Hartford Acc. & Indem. Co., 118 F.3d 1263, 1268 (8th Cir. 1997).

Initially, the court determines whether plaintiffs' negligence claim sounds in educational malpractice.  Generally, educational malpractice claims fall into one of three different categories: (1) the student alleges that the defendant-school negligently failed to provide him or her with adequate skills; (2) the student alleges that defendant-school negligently diagnosed or failed to diagnose the student's learning or mental disabilities; or (3) the student alleges that the defendant-school negligently supervised his or her training.  See Moore v. Vanderloo, 386 N.W.2d 108, 114 (Iowa 1986); see also Johnny C. Parker, Educational Malpractice: A Tort Is Born, 39 Clev. St. L. Rev. 301, 303 (1991).  Oftentimes the student is asserting the claim; however, third parties have also attempted to assert educational malpractice claims as well, usually contending they were injured by the school's

negligent teaching of the student.  Moss Rehab v. White, 692 A.2d 902, 905 (Del. 1997).  Courts have refused to recognize educational malpractice claims asserted against "public schools, institutions of higher learning, or private proprietary and trade schools."  Page v. Klein Tools, Inc., 610 N.W.2d 900, 905 (Mich. 2000).

This court predicts that the South Dakota Supreme Court would find that plaintiffs' negligence claim sounds in educational malpractice.  The court's prediction is guided by the Delaware Supreme Court's well-reasoned decision in Moss Rehab, 692 A.2d 902.  In Moss Rehab, the plaintiffs were injured in a car accident.  The driver of the car that struck plaintiffs' vehicle had previously completed training at the Moss Rehab Driving School for the Disabled.  Plaintiffs filed suit against the driving school, arguing that the school acted negligently in "evaluating, recommending and training" the driver who hit them.  Id. at 905.  Plaintiffs argued that their claim sounded in common law negligence rather than educational malpractice.  The Supreme Court of Delaware disagreed, stating plaintiffs' "allegations encompass the traditional aspects of education."  Id.  See also Moore, 386 N.W.2d at 113 (stating that injured patient's claim that chiropractic school negligently trained chiropractor sounded in educational malpractice); Page, 610 N.W.2d at 905 (holding claim sounded in educational malpractice when

plaintiff, who fell off a power pole, claimed trade school negligently trained him).

Analytically, plaintiffs' claims are indistinguishable from those asserted in Moss Rehab.  The gravamen of plaintiffs' claims are that FlightSafety negligently trained Bielstein by failing to provide him the skills and training necessary to detect and safely land following an exhaust system failure.  Specifically, plaintiffs allege that FlightSafety negligently created its curriculum by failing to include emergency procedures relating to an exhaust system failure.  Further, plaintiffs contend that FlightSafety used negligent teaching techniques by employing a simulator that does not accurately replicate the handling of a Cessna 340A.  In other words, plaintiffs are contesting the substance and manner of FlightSafety's training.  Plaintiffs' claims "encompass the traditional aspects of education," and thus, sound in educational malpractice.  See Moss Rehab, 692 A.2d at 905.

Plaintiffs rely on Doe v. Yale University, No. CV 900305365S, 1997 WL 766845 (Conn. Super. Ct. Nov. 28, 1997), an unpublished trial court opinion, to support their contention that their claim sounds in common law negligence rather than educational malpractice.  In Doe, a medical student in his residency program contracted HIV from performing a risky medical procedure.  The student sued Yale University for negligently failing to provide the student sufficient training and supervision to perform the

40

procedure.  Yale argued that the student was attempting to assert an

educational malpractice claim.  The court disagreed:

> Dr. Doe does not claim a failure in the defendant's overall
> educational program or that education did not equip him to be a
> good doctor.  Instead, his is a very precise claim based on Yale's
> alleged failure to train him adequately in needle safety and in
> the performance of the arterial line insertion which is the
> subject of this case, as well as the failure to supervise him as he
> undertook to perform that task . . . .

Doe, 1997 WL 766845, at *2.  The court then analogized Doe to a case where

the court permitted an architectural student to assert a negligent

supervision claim against Yale University when the student was injured

while operating a saw in the university's woodworking shop.

The court refuses to follow Doe in this case.  First, the court finds that

negligent failure to provide an overall education and negligent failure to train

how to perform a specific procedure is a distinction without a difference.  In

both instances, the plaintiff is alleging that the school did not teach the

student what he or she needed to know.  See Page, 610 N.W.2d at 905.

Second, the court finds Doe unpersuasive because the court never discusses

the policy consideration's underlying refusal to recognize educational

malpractice claims.  Finally, in Doe, the student was injured while

participating in his educational program.  Based thereon, the student

argued that Yale failed to supervise him during his program.  Here, Bielstein

had completed his training prior to the accident, and thus, cannot assert a

negligent supervision claim.  In short, the court predicts that the South Dakota Supreme Court would find that plaintiffs' negligence claim sounds in educational malpractice.

The court further predicts that the South Dakota Supreme Court would not recognize educational malpractice as a cognizable cause of action. With the lone exception of Montana, courts "have unanimously failed to recognize a cause of action for educational malpractice." Moore, 386 N.W.2d at 114; see also Sellers ex rel. Sellers v. Sch. Bd. of City of Manassas, Va., 960 F. Supp. 1006, 1013 (E.D. Va. 1997) (stating that "there is overwhelming judicial authority in opposition" to recognition of educational malpractice claims); Moss Rehab, 692 A.2d at 906 (stating that at least ten states and the District of Columbia have refused to recognize educational malpractice claims).

Additionally, sound public policy reasons suggest rejecting educational malpractice as a cognizable tort action.  Courts have offered four policy grounds for refusing to recognize educational malpractice claims:

> (1) the lack of a satisfactory standard of care by which to evaluate an educator; (2) the inherent uncertainties about causation and the nature of damages in light of such intervening factors as a student's attitude, motivation, temperament, past experience, and home environment; (3) the potential for a flood of litigation against schools; and (4) the possibility that such claims will embroil the courts into overseeing the day-to-day operations of schools.

42

Page, 610 N.W.2d at 903 (internal quotation omitted).  These public policy considerations apply to plaintiffs' claims in this case as well.

First, the court will struggle with establishing the appropriate standard of care to evaluate flight training schools, including FlightSafety. The Michigan Supreme Court recognized this problem in Page, 610 N.W.2d 900, when the court held that plaintiffs' claims for failing to teach alternative pole climbing techniques sounded in educational malpractice. Like the Michigan Supreme Court in Page, this court would have to decide "[h]ow much was [FlightSafety] required to teach?"  Id. at 906.  Schools, not courts, are in a better position to determine what should be taught.  See Moore, 386 N.W.2d at 114.

The second and third factors are closely related, at least in the aviation training context.  Pilot error and training will be a consideration in many, if not most, plane crash litigation.  Thus, if the court recognizes educational malpractice in this case, virtually every future plane crash will raise the specter of a negligent training claim against the flight school or aviation training center.  See id. at 115 (refusing to recognize educational malpractice because every medical malpractice claim will include an educational malpractice claim).  And, in these cases, the courts and juries will face inherently uncertain causation issues:  Did the school negligently train the student?  Did the student pay attention?  Was the student tired, ill,

43

distracted?  Too many factors contribute to the quality of a student's education, and recognizing educational malpractice invites speculation.  See Sellers ex rel. Sellers, 960 F. Supp. at 1014 & n.36.

Finally, the last policy consideration weighs heavily against permitting plaintiffs to proceed with their educational malpractice claim in this case. By recognizing educational malpractice, even if limited to cases involving physical injury, courts will end up running a large segment of higher education facilities.  If the court here decides that FlightSafety should have taught a different curriculum, there is no principled basis to stop it from determining what curriculum should be taught at medical schools, paramedic schools, commercial truck driving schools, and innumerable other technical and higher education facilities.  Public policy suggests that schools, not courts, need to make curriculum decisions.  See Moore, 386 N.W.2d at 115 ("[A]cademic freedom thrives on the autonomous decision-making by the academy itself.").

Based on the foregoing, the court predicts that the South Dakota Supreme Court will follow the overwhelming majority rule and refuse to recognize educational malpractice as a cause of action.  Plaintiffs' negligence claims against FlightSafety sound in educational malpractice.  Accordingly, FlightSafety is entitled to judgment as a matter of law, and FlightSafety's

44

motion for summary judgment (Docket 272) is granted as it pertains to plaintiffs' negligence claims.

FlightSafety also moves in limine (Docket 270) to prohibit Sommer from offering expert testimony regarding whether FlightSafety should have included information on exhaust failures in its curriculum and should have used a simulator that accurately replicated a Cessna 340A. Because the court grants summary judgment on these claims, this motion is denied. FlightSafety's motion to strike affidavit of Sommer (Docket 429) is also denied.

### B.    Federal Preemption

As an alternative basis, the court finds that FlightSafety is entitled to partial summary judgment because at least part of plaintiffs' negligence claim is preempted by the Act and its corresponding regulations. Federal preemption is an affirmative defense based upon the supremacy clause of the U.S. Constitution, "which states that laws of the United States made pursuant to the Constitution are the 'supreme Law of the Land.'" Wuebker v. Wilbur-Ellis Co., 418 F.3d 883, 886 (8th Cir. 2005) (quoting U.S. Const. art. VI, cl. 2). State law is preempted in three different instances: (1) when Congress explicitly states federal law preempts state law (express preemption); (2) when federal law "creates a scheme of federal regulation so pervasive that the only reasonable inference is that it meant to displace the

45

states (field preemption);" and (3) when state law and federal law conflict (conflict preemption).  Id.; see also Davenport v. Farmers Ins. Group, 378 F.3d 839, 842 (8th Cir. 2004).  "Congressional intent is the touchstone for determining the preemptive effect of a statute."  Wuebker, 418 F.3d at 886.  Further, federal regulations can preempt state law "if the agency intends its regulations to have preemptive effect, and the agency is acting within the scope of its delegated authority."  Chapman v. Lab One, 390 F.3d 620, 634 (8th Cir. 2004).  If any of the foregoing apply to this case, then federal preemption acts as an affirmative defense to plaintiffs' negligence claim.  See Wuebker, 418 F.3d at 886 (determining whether preemption acts as affirmative defense to plaintiff's tort claims).

As a preliminary matter, the court reiterates plaintiffs' theory of liability–FlightSafety acted negligently by failing to include safety procedures for an exhaust failure in its curriculum and by using a simulator that did not replicate the handling of a Cessna 340A.  FlightSafety argues that the Act, and the federal aviation regulations implemented based thereon, preempt this purported cause of action.  FlightSafety argues that the doctrines of field preemption and conflict preemption apply.[9]

---

[9] FlightSafety does not argue for application of express preemption, and thus, the court refrains from considering its application in this case.

46

### 1.     Field Preemption

FlightSafety argues that Congress, by adopting the Act, intended to preempt all state law affecting the field of aviation safety, including pilot training.  (Docket 273, at 16).  Field preemption occurs when the "mere 'volume and complexity' of agency regulations demonstrate an implicit intent to displace <u>all</u> state law in a particular area."  <u>Geier v. Am. Honda Motor Co.</u>, 529 U.S. 861, 885, 120 S. Ct. 1913, 1926, 146 L. Ed. 2d 914 (2000) (emphasis in original) (quoting <u>Hillsborough County v. Automated Med. Labs., Inc.</u>, 471 U.S. 707, 717, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985)).

Congress adopted the Act, which created the FAA and empowered the FAA to promote safety in the aviation industry.  <u>See</u> 49 U.S.C. § 44701. Notably, the Act contains a savings clause, which states that "[a] remedy under this part is in addition to any other remedies provided by law."  49 U.S.C. § 40120.  Pursuant to its authority granted by the Act, the FAA has adopted a broad-range of regulations affecting aviation safety.  <u>See generally</u> 14 C.F.R. pt. 1-199.  As a part of this regulatory scheme, the FAA has enacted regulations "governing the certification and operation of aviation training centers," including FlightSafety.  <u>See</u> 14 C.F.R. § 142.1(a).

FlightSafety argues that this expansive regulatory scheme preempts all state law affecting the field of aviation safety, including plaintiffs' tort claims here.  Neither the Supreme Court nor the Eighth Circuit has

determined whether the Act and federal aviation regulations preempt the field of aviation safety, thereby barring a tort-based personal injury claim. The courts that have considered the matter, however, are split.  Compare Greene v. B.F. Goodrich Avionics Sys., Inc., 409 F.3d 784, 795 (6th Cir. 2005) (finding field preemption of aviation safety and federal law determines standard of care applicable to aviation safety), cert. denied, 126 S. Ct. 1465 (2006); Abdullah v. Am. Airlines, Inc., 181 F.3d 363, 371-72 (3d Cir. 1999) (finding field preemption of aviation safety); with Cleveland ex rel. Cleveland v. Piper Aircraft Corp., 985 F.2d 1438, 1444 (10th Cir. 1993) (finding no field preemption of aviation safety), cert. denied, 510 U.S. 908, 114 S. Ct. 291, 126 L. Ed. 2d 240 (1993); Public Health Trust of Dade County, Fla. v. Lake Aircraft, Inc., 992 F.2d 291, 295 (11th Cir. 1993); Monroe v. Cessna Aircraft Co., No. 2:05CV250, 2006 WL 385300 (E.D. Tex. Feb. 17, 2006).  The Tenth Circuit's opinion in Cleveland and the Third Circuit's opinion in Abdullah are the seminal cases supporting each view.

In Cleveland, 985 F.2d 1438, a pilot who was injured when his plane struck a vehicle on the runway asserted a negligent design claim, arguing that the manufacturer negligently designed the rear pilot seat.  The manufacturer argued that federal preemption barred plaintiffs' tort claim. Specifically, the manufacturer argued that Congress, through the Act and its

corresponding federal aviation regulation, intended to preempt the entire field of aviation safety.

Judge Lay,[10] writing the panel decision, disagreed and held that Congress did not intend to preempt the field of aviation safety.  The Tenth Circuit acknowledged legislative history granting the Administration "'full responsibility and authority' over safety."  Id. at 1442 (quoting H.R. Rep. No. 2360 (1958), reprinted in 1958 U.S.C.C.A.N. at 3741).  Despite this broad grant of authority, the Tenth Circuit concluded that "the plain language of the Federal Aviation Act suggests that Congress intended that the Act have no general preemptive effect."  Id.  The court gleaned Congress's intent from the savings clause contained in the Act and the express preemption clause added by Airline Deregulation Act (ADA), which amended the Act in 1978.

The court noted that the Act contained a savings clause explicitly preserving "the remedies now existing at common law or by statute."  Id. at 1442 (quoting 49 U.S.C. App. § 1506).[11]  The court then noted that several

_____

[10] Notably, Judge Lay, a Senior Circuit Judge from the Eighth Circuit, was sitting by designation.  See Cleveland, 985 F.2d at 1440 n.1.

[11] In 1993, Congress replaced this section with the current savings clause contained at 49 U.S.C. § 40120.  See Act of July 5, 1994, Pub. L. No. 103-272, § 1(e), 108 Stat. 745, 1117.  Congress did not intend for this revision to cause a substantive change in the law.  H.R. Rep. No. 103-180, at 2, 276, reprinted in 1994 U.S.C.C.A.N. 818; cf. Skydive Factory, Inc. v. Me. Aviation Corp., 268 F. Supp. 2d 61,  64 (D. Me. 2003) (stating Congress did not intend to eliminate state tort claims with amendment).  Thus, case law interpreting the previous version of the savings clause applies equally to the current

other courts have interpreted this provision as maintaining state common law tort claims. "By its very words, the statute leaves in place remedies then existing at common law or by statutes." Id. at 1442-43.

Additionally, the court noted that Congress, in passing the ADA, adopted an express preemption clause affecting the aviation industry: "A State . . . may not enact or enforce a law, regulation, or other provision having the force or effect of law related to a price, route, or service of an air carrier that may provide air transportation . . . ." 49 U.S.C. § 41713. Using the "tool of statutory interpretation *expressio unius est exclusio alterius*," the court concluded that Congress's adoption of an express preemption provision defines the extent of state law Congress intended to preempt. Id. at 1443. Based on the foregoing, the Tenth Circuit held Congress did not intend to preempt the entire field of aviation safety.

The Cleveland court's reasoning must be considered in light of the later Supreme Court decision in Geier v. Am. Honda Motor Co., 529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000). In Geier, the Supreme Court considered the effect a savings clause and an express preemption provision had on application of implied, conflict preemption. The Geier decision dilutes the strength of the Tenth Circuit's argument based upon *expressio unius est exclusio alterius*, because the Supreme Court stated that

savings clause.

50

an express preemption provision does not bar application of implied preemption principles to other parts of the same statutory or regulatory scheme.  See id. at 873, 120 S. Ct. at 1921.

Additionally, some courts have interpreted Geier as abrogating the Tenth Circuit's reliance on the savings clause as evidence that Congress did not intend to preempt the field of aviation safety.  See Curtin v. Port Auth. of N.Y. & N.J., 183 F. Supp. 2d 664, 670 (S.D.N.Y. 2002).  The court, however, disagrees with this interpretation.  First, the court notes that Geier involved conflict preemption, not field preemption.  Additionally, Geier is completely consistent with the Tenth Circuit's ruling.  Geier states that Congress's adoption of a savings clause does not limit application of ordinary implied preemption principles.  Geier, 529 U.S. at 874, 120 S. Ct. at 1921. Pursuant to ordinary preemption principles, however, field preemption only occurs when Congress intended to preempt an entire field.  See Wuebker, 418 F.3d at 886.  Indeed, the Court in Geier acknowledged that it "look[s] for a specific statement of pre-emptive intent when it is claimed that the mere 'volume and complexity' of agency regulations demonstrate an implicit intent to displace all state law in a particular area . . . so-callled "'field pre-emption.'"  Geier, 529 U.S. at 884, 120 S. Ct. at 1927.  As recognized by the Tenth Circuit in Cleveland, the savings clause evidences Congress's intent to preserve state common law personal injury claims following adoption of the

51

Act.  The court concurs with the Tenth Circuit's analysis and finds that

Congress did not intend to preempt the entire field of aviation safety.

Two other statutory provisions support the court's conclusion.  The

first is an insurance requirement that requires air carriers to procure

insurance or to self-insure in order to pay "for bodily injury to, or death of,

an individual or for loss of, or damage to, property of other, resulting from

the operation or maintenance of the aircraft . . . ."  49 U.S.C. § 41112(a).

This insurance requirement acknowledges Congress's intent that state tort

claims survive adoption of the Act.  Cf. Hodges v. Delta Airlines, Inc., 44

F.3d 334, 338 (5th Cir. 1995) (refusing to interpret ADA's express preemption

provision as preempting state tort claims because it "would have rendered

any requirement of insurance coverage nugatory").

The other provision is GARA, which, as noted above, provides a rolling

repose period barring state tort claims if the defective part or aircraft is more

than 18 years old.  Congress adopted GARA in 1994.  In doing so, Congress

explicitly limited GARA's preemptive effect to state laws granting a cause of

action in contravention of the statute of repose.  See GARA, § 2(d).  GARA's

legislative history indicates that Congress intended GARA to preempt state

tort law in "one extremely limited instance," namely when the defective part

was over 18 years old.  H.R. Rep. No. 103-525(II), at 6 (1994), reprinted in

1994 U.S.C.C.A.N. 1644, 1648.  Congress's adoption of GARA to preempt

52

state tort law in this narrow instance indicates its recognition of the

continued viability of state tort claim following adoption of the Act.  See

Monroe, 2006 WL 385300, at *4.

FlightSafety relies on three cases to support its argument of field

preemption.  The first case is Abdullah, 181 F.3d 363, the seminal Third

Circuit case finding field preemption.  In Abdullah, several airline

passengers brought suit against the airline for injuries they sustained when

the flight encountered severe turbulence.  The Third Circuit held that the

Act and federal aviation regulations preempted the field of aviation safety.

As such, the court held that federal law, not state tort law, established the

airline's standard of care.  In order to reconcile FAA's savings clause,

however, the Third Circuit held that state tort remedies, namely damages,

were still available to plaintiffs if the airline violated the federal standard of

care.  Id. at 374-75.  Accordingly, Abdullah only permits recovery for

violation of federal aviation statutes or regulations.

The court disagrees with the Third Circuit's conclusion that Congress

intended to preempt the field of aviation regulation by adopting the Act.

First, in adopting the Act, Congress empowered the FAA to adopt minimum

safety standards.  See 49 U.S.C. § 44701.  Minimum standards of aviation

safety "do not preclude a finding of negligence where a reasonable person

would take additional precautions."  Sunbird Air Servs., Inc. v. Beech

Aircraft Corp., 789 F. Supp. 360, 363 (D. Kan. 1992).  Additionally,

Abdullah does not mention GARA and its narrow preemption of state tort

law affecting aviation safety.  In adopting GARA, Congress went to great

lengths limiting its preemption of state tort law in a narrow set of

circumstances.  This would have been unnecessary if Congress had already

preempted all state tort actions affecting aviation safety when it adopted the

Act.  Instead, as indicated above, Congress did not intend the Act to preempt

the entire field of aviation safety.  After considering both Cleveland and

Abdullah, this court finds Cleveland more persuasive and adopts it here.

See Monroe, 2006 WL 385300, at *9 (stating that Cleveland is "better

reasoned"); Vinnick v. Delta Airlines, Inc., 113 Cal. Rptr. 2d 471, 478 (Cal.

Ct. App. 2001) (finding Abdullah unpersuasive).  But see Curtin, 183 F.

Supp. 2d 664.

The second case FlightSafety relies on is Greene v. B.F. Goodrich

Avionics Systems, Inc., 409 F.3d 784 (2005).  In Green, the Sixth Circuit

adopted the reasoning of Abdullah, without even mentioning Cleveland or

any contrary authority.  The court rejects Greene for the same reasons as

Abdullah.

Finally, FlightSafety relies on Witty v. Delta Air Lines, Inc., 366 F.3d

380 (5th Cir. 2004).  In Witty, the plaintiff sued an airline for failure to warn

its passengers of the risk of forming blood clots from remaining seated in a

pressurized cabin for a long duration.  The Fifth Circuit held that the cause of action was preempted because it conflicted with federal aviation regulations delineating which warnings the airline must give to its passengers.  The Fifth Circuit explicitly narrowed its decision to the "precise issues" of that case.  Id. at 385.  This case does not support FlightSafety's position, because "Witty is a narrow opinion that only applies to warnings given to passengers on commercial airliners."  Monroe, 2006 WL 385300, at *4.

In conclusion, the court finds that Congress did not intend to preempt the field of aviation safety when it adopted the Act.  Thus, field preemption does not bar plaintiffs' negligence claim against FlightSafety in this case.

## 2.    Conflict Preemption

FlightSafety also argues that the doctrine of conflict preemption bars plaintiffs' negligence claims.  Conflict preemption exists when "it is impossible for a private party to comply with both state and federal law, and when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives'" of Congress or an administrative agency.  Wuebker, 418 F.3d at 887 (quoting Geier, 529 U.S. at 873, 120 S. Ct. at 146).  Unlike field preemption, conflict preemption does not require an "express statement of pre-emptive intent."  Geier, 529 U.S. at 884, 120 S. Ct. at 1927.

Here, plaintiffs argue that FlightSafety negligently fashioned the flight training curriculum by failing to provide training on the proper emergency procedures for handling an exhaust system failure.  Additionally, plaintiffs argue that FlightSafety negligently used a flight simulator that failed to replicate the actual handling of a Cessna 340A during the loss of power to one engine, such as during an exhaust failure.  The court will discuss each of these allegedly negligent acts separately.

As for plaintiffs' argument that FlightSafety should have added emergency procedures resulting from an exhaust failure to its curriculum, the court finds that federal aviation regulations, not a common law negligence standard, determine what emergency procedures FlightSafety must include in its course curriculum.  As noted above, 14 C.F.R. pt. 142 contains the federal regulations governing the operation of aviation training centers, including FlightSafety.  In order to operate its aviation training center, FlightSafety needed to obtain a training center certificate from the FAA.  See 14 C.F.R. § 142.5.  To obtain and retain its certificate, FlightSafety was required to use curriculum approved by the FAA.  See 14 C.F.R. §§ 142.5(b), 142.11(7).  A flight training facility risks forfeiting its certificate for failure to comply with an approved training program, including teaching unapproved curriculum.  See 14 C.F.R. § 142.37(e)-(f).  Accordingly, the

FAA, by approving the curriculum, dictates what material FlightSafety must teach.

Here, the undisputed evidence establishes that the FAA approved the curriculum taught to Bielstein.  (Docket 276, at ¶ 47; Docket 336 at ¶ 47).  Additionally, the undisputed evidence establishes that FlightSafety included in its curriculum all the emergency procedures contained in the Pilot Operating Handbook provided by Cessna for the Cessna 340A.  (Docket 276 at ¶ 45; Docket 336 at ¶ 45).  Furthermore, all evidence presented indicates that the FAA will not "authorize a training center to teach emergency procedures that are not contained in the Pilot's Operating Handbook." (Docket 280, Ex. 20, at 14; Docket 279, at ¶6).  Accordingly, the undisputed record establishes that FlightSafety could not have included exhaust failure emergency procedures without violating federal aviation regulations.

Plaintiffs purport to refute the evidence suggesting that the FAA will approve curriculum teaching only those emergency procedures contained in the Pilot Operating Handbook by citing to three federal regulations.  (Docket 336, at ¶ 49).  First, plaintiffs cite 14 C.F.R. § 142.11.  This section, however, details the application requirements for an aviation training center certificate.  It does not pertain to what material will be approved as part of the curriculum.  Next, plaintiffs cite § 142.9, which empowers the FAA to grant deviations or waivers from the regulations governing aviation training

centers.  No evidence suggests, however, that the FAA would grant such a waiver, thereby permitting FlightSafety to teach additional emergency procedures besides those in the Pilot's Operating Handbook.  Indeed, plaintiffs' expert testified that the FAA would not permit the teaching of additional procedures.  (Docket 280, Ex. 20, at 14).  Finally, plaintiffs cite § 142.81.  This section permits aviation training centers to seek approval to teach otherwise unapproved courses.  The section is inapposite in this case, however, because it explicitly states that it does not apply to courses taught to pilots.  See 14 C.F.R. § 142.81(b).  In short, plaintiffs' reliance on inapplicable federal regulations fails to rebut the undisputed evidence establishing that federal regulations prohibited FlightSafety from teaching emergency procedures relating to exhaust system failures.

Nevertheless, plaintiffs contend that FlightSafety was negligent for failing to teach these prohibited emergency procedures.  If this indeed constituted negligence, then state common law requires what is prohibited by federal aviation regulations, namely adding emergency procedures not contained in the Pilot's Operating Handbook to FlightSafety's curriculum. This is a classic example of a "'conflict' that make[s] it 'impossible' for private parties to comply with both state and federal law." Geier, 529 U.S. at 874, 120 S. Ct. at 1921; see also Wuebker, 418 F.3d at 887 ("A court will find that an agency intends for a regulation to preempt a state law when a

regulation conflicts with a state law."). Accordingly, the Supremacy Clause of the U.S. Constitution bars plaintiffs' negligence claim based on this theory. See Geier, 529 U.S. at 874, 120 S. Ct. at 1921.

As for plaintiffs' contention that FlightSafety failed to utilize a simulator that properly replicated a Cessna 340A, the court does not find conflict preemption. Like course curriculum, all flight simulators used in training must be approved by the FAA. See 14 C.F.R. §§ 142.39, 142.59. Further, the undisputed evidence establishes that FlightSafety's flight simulator used by Bielstein was approved by the FAA. Unlike the flight training curriculum, however, nothing suggests that the FAA would prohibit FlightSafety from seeking approval of and using a flight simulator that accurately simulated the handling of a Cessna 340A during a exhaust system failure. Accordingly, there is no conflict preemption.

In conclusion, as an alternative basis, the court finds that FlightSafety's motion for summary judgment (Docket 270) on plaintiffs' negligence claim is granted in part. Specifically, the court finds that plaintiffs' negligence claim based on FlightSafety's failure to include additional emergency procedures in its curriculum is preempted as a matter of law.

## VIII.  Wrongful Death Remedies

Cessna and FlightSafety move for partial summary judgment relating to the damages recoverable in a wrongful death action.  Several questions are raised.  First, whether plaintiffs can recover damages for pain and suffering on their survival claim.  Second, whether punitive damages are recoverable in a wrongful death action.[12]   Third, whether Sheesley's estate can recover for the difference between the fair market value of Sheesley's stock in Action Mechanical and what Sheesley's estate received pursuant to a pre-accident buy-sell agreement.

### A.    Survival Claim

In a survival action, a personal injury claim survives the death of the injured party, and the injured party's estate recovers personal injury damages that the decedent could have recovered but for his or her death. See SDCL 21-5-1; see also Ammann v. Massey-Ferguson, Ltd., 933 F. Supp. 840, 842 (D.S.D. 1996).  Survival actions are statutorily created because, at common law, the personal injury claim abated upon the death of the injured party.  See Yellow Horse v. Pennington County, 225 F.3d 923, 926 n.3 (8th Cir. 2000) (applying South Dakota law).  Plaintiffs have abandoned their survival claims and their claims for pain and suffering.  (Docket 323).

---

[12] The issue of recoverable damages is governed by South Dakota law in this diversity case.  See Bethel v. Janis, 597 F. Supp. 56, 59 (D.S.D. 1984).

Accordingly, defendants' motion for partial summary judgment on plaintiffs' survival action which seeks damages for pain and suffering is granted.

### B. Punitive Damages

Cessna and FlightSafety argue that a wrongful death action cannot support a claim for punitive damages. This presents a pure matter of law, well suited for disposition through summary judgment. See White Consol. Indus., Inc. v. McGill Mfg. Co., 165 F.3d 1185, 1189-90 (8th Cir. 1999). Specifically, the court must determine the interplay between SDCL 21-3-2, which permits imposition of punitive damages by the jury, and the statutory enactments creating a cause of action for wrongful death in South Dakota, see SDCL 21-5-5 to 21-5-9. The South Dakota Supreme Court has not decided whether punitive damages are recoverable in a wrongful death action, and thus, this court must predict how the South Dakota Supreme Court would rule if it considered the matter. See Lindsay Mfg. Co., 118 F.3d at 1268.

SDCL 21-3-2 permits the jury to grant punitive damages in a tort case:

> In any action for breach of an obligation not arising from
> contract, where the defendant has been guilty of oppression,
> fraud, or malice, actual or presumed, or in any case of wrongful
> injury to animals, being subjects of property, committed
> intentionally or by willful and wanton misconduct, in disregard
> of humanity, the jury, in addition to the actual damage, may
> give damages for the sake of example, and by way of punishing
> the defendant.

61

As a general matter, punitive damages "are recoverable in all actions for damages based upon tortious acts which involve circumstances or ingredients, of malice, fraud, or insult, or a wanton and reckless disregard of the rights of the plaintiff." Hannahs v. Noah, 158 N.W.2d 678, 682 (S.D. 1968) (internal quotation omitted).  This includes causes of action for strict liability in tort and negligence.  See Olson-Roti v. Kilcoin, 653 N.W.2d 254, 259 (S.D. 2002).  Based thereon, plaintiffs argue that their claims for strict liability in tort, defective design, and negligence support a claim for punitive damages.

Irrespective of their specific theories of liability, plaintiffs are asserting a wrongful death action, and wrongful death actions are creatures of statute.  See Jirsa v. Ice, 217 N.W.2d 465, 467 (S.D. 1974).  Further, SDCL 21-5-7 purports to limit the remedies available in a wrongful death action: "In every action for wrongful death the jury may give such damages as they think proportionate to the pecuniary injury resulting from such death to the persons respectively for whose benefit such action shall be brought." Plaintiffs' "exclusive remedy" for defendants' allegedly tortious acts that caused the decedents' death is "an action under the wrongful death statute." See Bethel v. Janis, 597 F. Supp. 56, 59 (D.S.D. 1984).

The court predicts that the South Dakota Supreme Court would prohibit the recovery of punitive damages in a wrongful death action.  In

Bethel, 597 F. Supp. at 59, Honorable Judge Porter considered this very issue and made the same prediction—holding that § 21-3-2 does not apply to a wrongful death claim.  Judge Porter noted that wrongful death actions did not exist at common law, and thus, the wrongful death statutes provided the plaintiffs' sole remedy.  And, the wrongful death statute only permitted "recovery of actual or compensatory damages."  Id.  Judge Porter reached this conclusion based upon the legislature's amendment of an earlier version of the wrongful death statute in 1887 to explicitly eliminate the availability of punitive damages.

The court concurs with Judge Porter's prediction on how the South Dakota Supreme Court would rule.  This comports with the plain language of § 21-5-7, which only permits recovery of "damages . . . proportionate to the pecuniary injury" experienced by the plaintiffs.  Based on this language in a previous version of the statute, the South Dakota Supreme Court explicitly stated that "recovery for wrongful death is limited to actual or compensatory damages."  Hodkinson v. Parker, 16 N.W.2d 924, 926 (S.D. 1944).  Instead of compensating for an injury, punitive damages punish or deter defendants' conduct.  See Olson-Roti, 653 N.W.2d at 260-61 ("Punitive damages in South Dakota are not designed to compensate victims.").  Accordingly, awarding punitive damages in a wrongful death claim contradicts the plain meaning of § 21-5-7.

Additionally, the amendment history of § 21-5-7 indicates that the
South Dakota Legislature explicitly chose to prohibit recovery of punitive
damages in a wrongful death action.  The first version of the South Dakota
wrongful death statute "allowed a claim for punitive damages for a wrongful
death." Anderson v. Lale, 216 N.W.2d 152, 155 (S.D. 1974).  Then, in 1887,
the legislature amended the wrongful death statute by removing the word
punitive from the statute.  Id.  In 1895, the South Dakota Supreme Court
interpreted this revision "as showing the intention of the legislature to
change the rule allowing a recovery for 'punitive,' exemplary, or vindictive
damages, and to limit parties to a recovery for actual or compensatory
damages only." Smith v. Chicago, M. & St. P. Ry. Co., 62 N.W. 967, 968
(S.D. 1895).  Notably, the court in Smith interpreted the wrongful death
statute to only permit recovery of pecuniary loss.  See id.; see also Anderson,
216 N.W.2d at 155.  In 1909, the legislature "codified the term pecuniary
injury" as the damages available under the wrongful death statute.
Anderson, 216 N.W.2d at 155.  Accordingly, the 1909 legislature explicitly
adopted the Smith court's construction of the statute, which only permitted
recovery of compensatory damages.  Then, in 1947, the legislature again
amended the statute by replacing the term "pecuniary" with the word "all" as
the modifier of recoverable damages.  Id.  But in 1967, the legislature
amended the statute for the final time by replacing the word "all" with

64

"pecuniary," thereby reverting to the pre-1947 statute.  This amendment exhibited the legislature's intent to revert to the Smith court's limitation on recoverable damages, namely compensatory or actual damages.  See Anderson, 216 N.W.2d at 158 (noting presumption that Legislature is aware of judicial construction of a statute when reenacting the statute).

Moreover, the South Dakota Supreme Court has indicated that recovery in a wrongful death action is limited to the remedy provided by § 21-3-2.  See Hoekstra v. Helgeland, 98 N.W.2d 669, 686 (S.D. 1959).  In Hoekstra, the plaintiff argued that she was denied full recovery because the wrongful death statute only permitted recovery of "damages not exceeding in any case $20,000 as [the jury] may think proportionate to all injury resulting from such death . . . ."  Id. at 684.  The court stated that plaintiff's damages were limited to the recovery provided by the wrongful death statute, including the statute's $20,000 statutory cap.  See id.; see also Hodkinson, 16 N.W.2d at 926.  Accordingly, the court finds that punitive damages are not available in a wrongful death action in South Dakota.

Plaintiffs acknowledge that punitive damages are not "damages . . . proportionate to the pecuniary injury" under SDCL 21-5-7.  Nevertheless, plaintiffs argue that punitive damages are recoverable under SDCL 21-3-2, because § 21-5-7 merely limits recoverable compensatory damages in a wrongful death claim.  And, because punitive damages punish, not

65

compensate, § 21-5-7 has no effect on the punitive damages recoverable under § 21-3-2.

Plaintiffs' argument lacks merit because, as discussed above, § 21-5-7 provides the exclusive remedy available in a wrongful death action.  Simply put, the specific limitation on wrongful death remedies contained in § 21-5-7 controls this case, not the general availability of punitive damages in all tort cases under § 21-3-2.  The South Dakota Supreme Court's decision in Wyman v. Terry Schulte Chevrolet, Inc., 584 N.W.2d 103 (S.D. 1998), illustrates this principle.  In Wyman, the court held that punitive damages under SDCL 21-3-2 were not recoverable in a claim for deceptive trade practices because the pertinent deceptive trade practice statute limited recovery to "'actual damages suffered.'"  Id. at 107 (quoting SDCL 37-24-13). Based on this specific remedy statute, the court held that "the legislature has foreclosed the recovery of punitive damages" in a deceptive trade practices case.  Id.  This case is analytically identical to Wyman, and the court follows it in finding that plaintiffs cannot recover punitive damages in their wrongful death action.

Based on the foregoing, the court predicts that the South Dakota Supreme Court would hold that punitive damages are not recoverable in a wrongful death action.  Further, because all of plaintiffs' tort claims are based upon the wrongful death statute, plaintiffs cannot recover punitive

66

damages in this case.  Accordingly, Cessna's and FlightSafety's motions for partial summary judgment (Docket 243, 272) prohibiting recovery of punitive damages are granted.

### C.    Shane Sheesley's Stock Price

Cessna moves in limine to prevent Don Frankenfeld, one of plaintiffs' damages experts, from testifying about the alleged loss that Shane Sheesley's estate incurred when his death caused the sale of his stock in Action Mechanical at a price less than fair market value.  Cessna argues that this measure of damages is not recoverable in a wrongful death action, thereby making Frankenfeld's testimony inadmissible.  Similarly, FlightSafety moves for partial summary judgment and argues that this measure of damages is not recoverable in a wrongful death action as a matter of law.

As noted above, South Dakota's pertinent wrongful death statute permits the recovery of "such damages as [the jury] may think proportionate to the pecuniary injury resulting from such death" to the wife and children of the decedent.  SDCL 21-5-7.  "Pecuniary loss" means both a beneficiary's economic loss and the beneficiary's loss of advice, assistance, and protection caused by the decedent's death.  See Sander v. Geib, Elston, Frost Prof'l Ass'n, 506 N.W.2d 107, 119 (S.D. 1993).  The South Dakota wrongful death

67

statute is remedial, and thus, construed liberally.  <u>Anderson</u>, 216 N.W.2d at 155-56.

"In wrongful death actions, plaintiff has the burden of proving the pecuniary loss from the death of the decedent."  <u>Estate of He Crow ex rel. He Crow v. Jensen</u>, 494 N.W.2d 186, 192 (S.D. 1992).  Plaintiffs must present evidence that they can reasonably expect to receive the economic benefit from the decedent.  <u>See</u> <u>Welch v. Haase</u>, 672 N.W.2d 689, 698 (S.D. 2003).  Speculative damages are not recoverable.  <u>See</u> <u>McCleod v. Tri-State Milling Co.</u>, 24 N.W.2d 485, 491-92 (S.D. 1946).  And, the court can exclude speculative evidence, including expert testimony.  <u>See</u> <u>Dairy Farmers of Am., Inc. v. Travelers Ins. Co.</u>, 391 F.3d 936, 944 (8th Cir. 2004).

Here, Frankenfeld purportedly will testify about the "ownership loss" experienced by Shane Sheesley's estate as a result of his death.  Some background information is needed to understand Frankenfeld's opinion.  At the time of his death, Shane Sheesley owned 20,000 shares of Action Mechanical, amounting to 43.5 percent of the company.  His father, Dale Sheesley, was one of the other shareholders in this closely held family corporation.  In 1994, Shane Sheesley and Dale Sheesley entered into a "Stock Purchase (Buy-Sell) Agreement" (Buy-Sell Agreement).  (Docket 280, Ex. 24).  The Buy-Sell Agreement provided, in pertinent part, that if Dale Sheesley died while Shane Sheesley was still alive, then Dale Sheesley's

estate must sell and Shane Sheesley must buy Dale Sheesley's shares.

Similarly, the agreement provided that if Shane Sheesley died first, then

Shane Sheesley's estate must sell and Dale Sheesley must buy all of Shane

Sheesley's shares. The Buy-Sell Agreement also delineates a predetermined

formula to ascertain the price of the shares sold in the event of either Dale

or Shane's death. According to the agreement, the price paid shall be the

book value per share, with book value being ascertained by an independent

certified public accounting firm.

The undisputed evidence establishes that Shane Sheesley predeceased

Dale when he died in the plane crash on August 23, 2000. Shane Sheesley's

death triggered the Buy-Sell Agreement, and David Reimer, a certified public

accountant, calculated the book value of the shares according to the method

stated in the Buy-Sell Agreement.[13] Based on Reimer's calculation of the

book value per share, Dale Sheesley was required to purchase Shane

Sheesley's shares from his estate for the amount of $876,900. (Docket 280,

Ex. 25; Docket 296, Ex. 4). Then, on December 15, 2000, Dale and Stacie

Sheesley, as personal representative of Shane Sheesley's estate, entered into

a Settlement Agreement whereby Dale Sheesley agreed to pay the full

---

[13] Actually, Reimer deviated slightly from the method in Buy-Sell
Agreement when he calculated the book value. No one argues, however, that
this deviation affected the amount Shane's estate actually received from the
sale of the stock.

$876,900.  (Docket 280, Ex. 25).  The undisputed evidence states that Dale Sheesley complied with the Settlement Agreement.  (Docket 280, Ex. 26).

Plaintiffs proffer Frankenfeld's opinion that Shane Sheesley's estate experienced a pecuniary loss as a result of this pre-negotiated sale. Frankenfeld opined that at the time of Shane's death, the actual value of "Shane's ownership [of Action Mechanical] was higher."  (Docket 295, Ex. A). Frankenfeld opined that the fair market value of Action Mechanical was approximately seven million dollars.  Based thereon, Frankenfeld opined that the fair market value of Shane Sheesley's stock was approximately three million dollars.  Thus, Frankenfeld opined that Shane Sheesley's estate (and thus his beneficiaries) lost approximately two million dollars in value by Shane Sheesley's untimely death.

Cessna argues that the alleged two million dollar loss is not recoverable in a wrongful death action.  Cessna acknowledges that loss of future earning capacity is recoverable; however, Cessna argues that the South Dakota Supreme Court decision in Davis v. Knippling, 576 N.W.2d 525 (S.D. 1998), states that the loss of the stock value does not qualify as loss of earning capacity.  In Davis, the court held that "the established rule elsewhere prohibits consideration of business profits and investment income in calculating lost earning capacity."  Id. at 530.  Here, the undisputed evidence establishes that Shane Sheesley's stock value is a source of

business profit or investment income derived from the intensive capital assets and the over one-hundred of Action Mechanical's employees.  See Davis, 576 N.W.2d at 530 & n.4.  Accordingly, the lost stock value is not recoverable in this wrongful death action under the theory of lost earning capacity.

Plaintiffs acknowledge that the lost value does not qualify as lost earning capacity, but argue that the lost value is recoverable as direct decrease in the value of the estate caused by Shane Sheesley's untimely death.  The court disagrees.  The previously negotiated  "Buy-Sell Agreement" determined the price of Shane's stock upon his death. Accordingly, the "Buy-Sell Agreement," not Cessna's allegedly negligent actions, prevented Shane Sheesley's estate from recovering the fair value of his stock.  As such, the lost stock value is not a "pecuniary injury resulting from such death."  See SDCL 21-5-7 (emphasis added); cf. Wuest ex rel. Carver v. McKennan Hosp., 619 N.W.2d 682, 698 (S.D. 2000) (stating negligent act must proximately cause the alleged injury).  Further, any argument that Shane Sheesley's beneficiaries experienced a pecuniary loss is speculative because nothing indicates that they would have reaped the benefit of the fair value of Shane Sheesley's shares.  Accordingly, Cessna's motion in limine (Docket 295) is granted.  Further, FlightSafety's motion for

71

partial summary judgment (Docket 272) is granted on the issue of whether

the alleged ownership loss is recoverable.

## IX.   **FlightSafety's Breach of Contract**

Plaintiffs contend that FlightSafety entered into a contract to provide

aviation training.  Further, plaintiffs argue that FlightSafety breached that

contract.[14]  FlightSafety moves for summary judgment, arguing that it fully

performed its contractual obligations.  Additionally, FlightSafety argues that

Stacie Sheesley, as personal representative of Shane Sheesley, and DeeAnn

Vermeulen, as personal representative of Thomas Vermeulen, lack standing

to assert the breach of contract claim.  For analysis purposes, the court

---

[14] Plaintiffs also contend that FlightSafety breached an express warranty, the implied warranty for a fitness for a particular purpose, and the implied warranty of merchantability.  (Civ. 03-5063, Docket 1, at ¶¶ 27-29). FlightSafety moves for summary judgment on the implied warranty claims, arguing that the implied warranties only apply to the sale of goods and FlightSafety provided services, not goods.  Plaintiffs do not dispute this argument in their response brief, and thus, the court finds plaintiffs have waived their claim based upon implied warranties.  See, e.g., Bruzer v. Danek Medical, Inc., No. Civ. 3-95-971/RHKJMM, 1999 WL 613329, at *5 n.5 (D. Minn. Mar. 8, 1999).

As for the express warranty claim, plaintiffs argue that FlightSafety made representations that it would "provide[ ] thorough and complete flight training for certain models of aircraft, including the Cessna 340, and that completion of its course would be commensurate with a level of safety in the operation of such aircraft."  (Civ. 03-5063, Docket 1, at ¶ 29).  Plaintiffs have presented no evidence of actual, written warranties.  As such, the court finds that this claim is properly characterized as breach of an implied-in-fact contract, with the representations being part of the conduct used to ascertain the terms governing the contract.  See Jurrens v. Lorenz Mfg. Co., 578 N.W.2d 151, 154 (S.D. 1998).

divides the decedents into two groups: (A) Bielstein; and (B) Sheesley and Vermeulen.

### A.     Robert Bielstein

Plaintiffs and FlightSafety acknowledge that Bielstein contracted with FlightSafety for the provision of training services.[15]  FlightSafety argues that it fully performed its contractual obligations, and thus, it is entitled to judgment as a matter of law.  Plaintiffs disagree, arguing that a question of fact remains whether FlightSafety fully performed.

According to South Dakota law, a breach of contract claim has three elements: a binding contract, breach of the contract, and damages.  See Guthmiller v. Deloitte & Touche, LLP, 699 N.W.2d 493, 498 (S.D. 2005).  A contract can be either express or implied.  SDCL 53-1-3.  "An express contract is one, the terms of which are stated in words.  An implied contract is one, the existence and terms of which are manifested by conduct."  Id. "Conduct" can include both the parties' actions and words.  Jurrens v. Lorenz Mfg. Co., 578 N.W.2d 151, 154 (S.D. 1998).  "The existence and governing terms of an implied contract present questions of fact to be

---

[15] A material question of fact exists whether the service contract was actually between Bielstein and FlightSafety or Action Mechanical and FlightSafety.  Viewing the evidence in the light most favorable to plaintiffs, however, the court must presume that FlightSafety contracted with Bielstein. See Vette Co., 612 F.2d at 1077.

decided by a jury.'" Holland v. FEM Elec. Ass'n, 637 N.W.2d 717, 719 (S.D.

2001) (quoting Jurrens, 578 N.W.2d at 154).

Here, the parties agree a binding contract existed for the provision of

aviation training services.  The parties disagree, however, about the terms of

that contract.  The contract was not express because no evidence indicates

the terms of the agreement were memorialized in a writing.  See SDCL 53-1-

3.  Nevertheless, the court may infer the parties exchanged promises,

thereby entering into a contractual relationship, by their conduct.  See

Jurrens, 578 N.W.2d at 153.  This is known as an implied-in-fact contract,

and it terms bind the parties just like an express contract.  See id. at 154.[16]

The conduct of the parties, including communications, determine the terms

governing an implied-in-fact contract.  See id.  The existence of an implied

contract and its terms are questions of fact for the jury.  See Holland, 637

N.W.2d at 719.

Bielstein argues that the implied contract included promises by

FlightSafety to provide aircraft specific training in both normal and

emergency situations, and to provide a simulator that accurately replicated

the handling of a Cessna 340A.  There is evidence to support this

_____

[16] FlightSafety suggests that the contract must be in writing to be
enforceable.  This case, however, does not implicate the statute of frauds, and
the implied contract is enforceable even in the absence of a writing.  See SDCL
53-8-1, 53-8-2.

74

contention.  In Bielstein's pilot training course evaluation, which was completed after his training, Bielstein stated: "My initial contact with [FlightSafety] indicated that the simulator was aircraft specific (340A).  What I found upon arrival was that it was not. . . . I feel my training suffered somewhat because of this."  (Docket 280, Ex. 14, at 10).  Additionally, FlightSafety's marketing materials suggest that the simulator is type specific and modified to replicate a Cessna 340A.  (Docket 280, Ex. 10, at 11).  Further, the marketing materials suggest that the simulator will accurately replicate how the pilot's aircraft will handle in emergency situations, including an engine failure during flight speed below Vmc.[17]  (Docket 280, Ex. 10, at 6).  Based on the foregoing, a question of fact for the jury exists whether the terms of the implied-in-fact contract obligated FlightSafety to provide a type specific simulator that accurately duplicated the actual aircraft's handling in an emergency situation.  See Holland, 637 N.W.2d at 719.

Further, if the jury finds that the implied-in-fact contract included these terms, then there is evidence to indicate FlightSafety breached the contract.  Bielstein noted that the simulator he used was not type specific and did not accurately replicate the cabin of a Cessna 340A.  (Docket 280,

---

[17] Vmc is the minimum speed the aircraft can fly before losing control. (Docket 426-3).

Ex. 14, at 10).  Additionally, Donald Sommer testified that the simulator did

not accurately simulate the handling of a Cessna 340A with engine failure.

Sommer testified that the simulator indicated the plane would stall before

reaching Vmc.  This is not accurate, because Vmc would occur before

stalling.  (Docket 280, Ex. 20, at 17).  Once again, this presents a question

of fact for the jury.  Schelske v. S.D. Poultry Coop., Inc., 465 N.W.2d 187,

189 (S.D. 1991) (stating breach is question of fact for the jury).  Accordingly,

FlightSafety's motion for summary judgment on Bielstein's breach of

contract claim (Docket 272) is denied.

**B.    Shane Sheesley and Thomas Vermeulen**

Like Bielstein, Sheesley and Vermeulen have asserted breach of

contract claims against FlightSafety even though nothing suggests that

Sheesley or Vermeulen were parties to the contract with FlightSafety.

Sheesley and Vermeulen argue that they can assert a breach of contract

claim because they "were members of the foreseeable class of individuals to

whom the benefit of the contract inured," making them third-party

beneficiaries of the contract.  (Docket 334, at 25).

According to South Dakota law, a third-party beneficiary can assert a

breach of contract claim.  SDCL 53-2-6.  Section 53-2-6 provides:  "A

contract made expressly for the benefit of a third person may be enforced by

[him or her] . . . ."  In order to qualify as a third-party beneficiary, Sheesley

and Vermeulen "must show clearly that [the contract] was entered into with the intent on the part of the parties thereto that such third party should be benefitted thereby" Trouten v. Heritage Mut. Ins. Co., 632 N.W.2d 856, 859 (S.D. 2001). There is no evidence that Bielstein (or Action Mechanical) entered into the aviation training service contract to benefit Sheesley or Vermeulen. Accordingly, neither Sheesley nor Vermeulen can assert a breach of contract claim, and FlightSafety's motion for summary judgment (Docket 272) on Sheesley's and Vermeulen's breach of contract claims is granted.

## X.      Plaintiffs' Motions in Limine

Plaintiffs move in limine to prohibit defendants from referring to or admitting into evidence: (1) that Bielstein was under the influence of diphenhydramine at the time of the accident; (2) that Bielstein concealed his alleged chronic sinusitis and self-medication with diphenhydramine; (3) that Bielstein's tissue contained ethanol, and (4) the NTSB Accident Report and NTSB Factual Report.

### A.      Under the Influence of Diphenhydramine

Defendants contend that pilot error caused the accident. In support of this contention, defendants purport to offer the expert testimony of Charles A. Berry, M.D., a board-certified physician in aerospace medicine. In his report, Dr. Berry opines that Bielstein's "illness, use of medication,

stress level, and acute fatigue contributed to the causation of this accident."
(Docket 292-2, at 9).  Plaintiffs move to exclude Dr. Berry (and all other
witnesses) from testifying that Bielstein's use of medication, specifically
diphenhydramine, contributed to the accident in any regard.

Diphenhydramine, commonly known as Benadryl, is an over-the-
counter antihistamine.  (Docket 254-2).  Diphenhydramine has a sedating
side effect, and is even used as sleep aid.  (Docket 292-2, at 5).  Based on
this sedative effect, diphenhydramine is not approved by the FAA for pilot
use while flying.  (Docket 292-2, at 5).

Following the accident, an autopsy of Bielstein indicated that his liver
contained .343 micrograms per gram of diphenhydramine and that his
kidneys contained 2.991 micrograms per gram of diphenhydramine.  No
blood tests were performed to ascertain the level of diphenhydramine in
Bielstein's blood at the time of the accident.  Based on the diphenhydramine
levels in Bielstein's tissue, Dr. Berry opines that diphenhydramine, and its
sedating effect, was a contributing factor to the accident.  Plaintiffs argue
that this expert testimony is inadmissible because it is unreliable and
irrelevant, and its prejudice substantially outweighs its probative value.

Fed. R. Evid. 702 governs the admissibility of expert testimony and
states:

78

> If scientific, technical or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a
> fact in issue, a witness qualified as an expert by knowledge,
> skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based
> upon sufficient facts or data, (2) the testimony is the product of
> reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

Under Rule 702, "the trial judge [has] the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993). The trial court acts as gatekeeper and evaluates the expert testimony to "ensure that it is reliable and sufficiently relevant to assist the jury in resolving the factual disputes." Miller v. Baker Implement Co., 439 F.3d 407, 413 (8th Cir. 2006). A district court has broad discretion in determining reliability and relevance. United States v. Vesey, 338 F.3d 913, 916 (8th Cir. 2003).

### 1. Reliability

The Supreme Court has identified four factors for courts to consider in evaluating the reliability of scientific expert testimony: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subject to peer review and publication; (3) whether the potential error rate is known; and (4) whether the theory or technique is generally accepted in the relative scientific community. Daubert, 509 U.S. at 593-94, 113 S. Ct. at

2796-97; see also First Union Nat'l Bank v. Benham, 423 F.3d 855, 861 (8th Cir. 2005).  These four reliability factors are not determinative or exhaustive, and the "inquiry envisioned by Rule 702 is . . . a flexible one."  Daubert, 509 U.S. at 595, 113 S. Ct. at 2797.  "Regardless of what factors are evaluated, the main inquiry is whether the proffered expert's testimony is sufficiently reliable."  First Union Nat'l Bank, 423 F.3d at 861.

Here, Dr. Berry opined in his expert report that the sedative effect of diphenhydramine was a contributing factor to the accident.  As discussed above, however, the toxicology analysis only ascertained the level of diphenhydramine in Bielstein's liver and kidneys.  Current scientific studies and methodology have not, however, ascertained the sedative effect of diphenhydramine on a person based on the level in that person's kidneys or liver.  (Docket 254-2, at 10, 254-5, at 6).  Indeed, Dr. Berry's own expert report states "I cannot state that there is absolutely no sedative side effect of the diphenhydramine at the time of the accident."  (Docket 292-2, at 8).  Dr. Berry did not, however, opine that Bielstein was experiencing sedative side effects.

Acknowledging that no studies have correlated tissue levels of diphenhydramine with sedative side effects, defendants rely on the expert opinion of Dr. Allen Jeffrey Parmet.  Dr. Parmet purports to extrapolate Bielstein's blood level of diphenhydramine at the time of the accident based

upon the level of diphenhydramine detected in his liver and kidneys.
Dr. Parment opined that Bielstein's blood level of diphenhydramine is fifty
times the amount contained in his liver.  Dr. Parment reached this
conclusion based upon the theory of "protein-bound fraction."  (Docket 245-
5, at 4).  According to the protein-bound fraction theory, 98 percent of
diphenhydramine binds to the protein in a person's blood, while the
remaining 2 percent travels to a person's tissue, including the liver.  Based
thereon, Dr. Berry opined that the .343 micrograms per gram of
diphenhydramine found in Bielstein's liver represented approximately
2 percent of the drug in his body, and about fifty times as much drug was
contained in his blood.

Plaintiffs argue that Dr. Parmet's protein-bound fraction theory
presents an unreliable scientific methodology that should be excluded under
Rule 702.  Defendants do not dispute the contention in their response brief.
Further, the evidence presented indicates that Dr. Parmet's theory is
unreliable.  Dr. Berry, defendants' own expert, stated: "There are [sic] no
data relating Diphenhydramine tissue levels to blood or plasma levels except
in toxic levels at autopsy."  (Docket 292-2).  Additionally, Edward J.
Barbieri, Ph.D, an expert in toxicology, stated that Dr. Parmet's theory is
based upon a misunderstanding of the exchange of diphenhydramine
between the blood and other tissues (including the liver) during the

81

metabolism of diphenhydramine.  (Docket 254-4, at 4).  Dennis Canfield, Ph.D., a toxicologist who manages the bioaeronautical sciences research laboratory at the FAA, stated that his laboratory did not determine the sedative effect of diphenhydramine based upon tissue levels because "trying to correlate [tissue levels] back to a blood value is very difficult."  (Docket 254-2).  Moreover, nothing indicates that Dr. Parmet's theory has been tested, has been subject to peer review, or that the error rate is known. Additionally, the evidence above indicates that it is not generally accepted by the relevant scientific community.  Accordingly, the court finds that Dr. Parmet's protein bound fraction theory satisfies none of the Daubert reliability factors and is unreliable and inadmissible under Rule 702.

Without admission of Dr. Parmet's unreliable theory, defendants cannot establish the level of diphenhydramine in Bielstein's blood. Defendants can only prove he had diphenhydramine in his liver and kidneys.  As discussed below, however, this evidence is both irrelevant and its probative value is substantially outweighed by the risk of misleading and confusing the jury.

### 2.    Relevance and Rule 403 Balancing Test

Under Rule 702, expert testimony only assists the trier of fact if it is relevant to the issues in the case.  "The relevancy of the testimony depends on whether it can properly be applied to assist the trier of fact to decide facts

in issue." <u>Nichols v. Am. Nat'l Ins. Co.</u>, 154 F.3d 875, 883 (8th Cir. 1998).

Here, defendants argue that the evidence is relevant because

diphenhydramine has a well established sedative effect.

This presupposes, however, that Bielstein was experiencing

diphenhydramine's sedative side effects at the time of the accident.  There is

no evidence to support that conclusion.  Indeed, all the expert testimony in

this case indicates that no one can ascertain whether Bielstein was

experiencing the sedative side effects of diphenhydramine based on the level

of drug in his liver and kidneys.  (Docket 254-2, at 10; 254-4, at 7; 254-5, at

6; 254-6, at 6)   Dr. Parmet, defendants' expert, succinctly described current

level of scientific awareness:

> Q:    Do you intend to tell the jury that Mr. Bielstein was
>       sedated, under the influence of the sedative effects of
>       diphenhydramine at the time he was operating his
>       aircraft?
>
> A:    That's probably beyond the scientific knowledge at this point . . .

(Docket 254-5, at 6).  Similarly, Dr. Berry merely opines that he cannot rule

out that Bielstein was experiencing the sedative side effects of the

diphenhydramine at the time of the accident.  (Docket 292-2, at 8).  Without

evidence that Bielstein was actually experiencing the sedative side effects,

the evidence of diphenhydramine in his tissue levels does not make pilot

error a more probable cause of the accident, and thus, is irrelevant.  <u>See</u>
Fed. R. Evid. 401.

Additionally, under Federal Rule 403, the court finds the evidence is
inadmissible because "its probative value is substantially outweighed by the
danger of . . . confusion of the issues [or] misleading the jury . . . ."  "'Expert
evidence can be both powerful and quite misleading because of the difficulty
in evaluating it.  Because of this risk, the judge in weighing possible
prejudice against probative force under Rule 403 of the present rules
exercises more control over experts than over lay witnesses.'"  <u>United States</u>
<u>v. Kime</u>, 99 F.3d 870, 884 (8th Cir. 1996) (quoting <u>Daubert</u>, 509 U.S. at 595,
113 S. Ct. at 2798).

Here, the evidence is only probative if Bielstein was actually sedated
by the diphenhydramine in his tissue at the time of the accident.  As noted
above, however, this is unascertainable.  Accordingly, the evidence has
minimal probative value.

Additionally, there is a high risk of confusing or misleading the jury by
admitting this evidence.  Dr. Berry's expert report indicates that studies
have shown therapeutic doses of diphenhydramine "had a more detrimental
effect on driving than a blood alcohol level of 0.1%."  (Docket 292-2).
Without evidence that Bielstein was actually sedated at the time of the
accident, this presents a substantial risk of confusing or misleading the

84

jury, particularly when combined with Dr. Berry's expert opinion that
diphenhydramine contributed to the accident.  Cf. Jetcraft Corp. v.
FlightSafety Int'l, 16 F.3d 362, 366 (10th Cir. 1993) (affirming trial court's
decision to exclude evidence of pilot's use of cold medication with sedative
side effect under Rule 403 when evidence did not indicate pilot was
experiencing side effects on the day of the accident).  Accordingly, plaintiffs'
motion in limine (Docket 242) is granted, and all parties are prohibited from
presenting evidence or arguments referring to the fact that Bielstein had
diphenhydramine in his liver and his kidneys, that Bielstein was under the
influence or sedated by the diphenhydramine at the time of the accident, or
that the diphenhydramine contributed to accident.

**B.      Chronic Sinusitis and Self-Medication**

Plaintiffs also move to exclude evidence suggesting that Bielstein
allegedly suffered from chronic sinusitis and self-medicated by taking
diphenhydramine.  Both Dr. Berry and Dr. Parmet opined that Bielstein
suffered from chronic sinusitis.  (Docket 292-2, at 4; Docket 254-5, at 7).
Both apparently reached this conclusion based upon the testimony of
Bielstein's ex-wife Miriam and his son Sean.  Dr. Berry and Dr. Parmet both
opined that Bielstein was obligated to disclose his chronic sinusitis and
diphenhydramine use to the FAA during his examination for a medical
certificate, and thus, misrepresented his medical status to the

Administration.  (Docket 292-2, at 8; Docket 254-5, at 8).  Dr. Parmet opines

that if Bielstein disclosed his sinusitis and diphenhydramine use, then the

Administration would have denied his medical certificate, and thus, he

would not have been flying the plane at the time of the accident.  He further

opines that this was a causative factor because pilot error caused the crash,

and if Bielstein was not flying, he could not have erred.  (Docket 254-5).

　　　The court finds that evidence of Bielstein's chronic sinusitis and

diphenhydramine usage is inadmissible under Rule 403 because the

probative value of this evidence is substantially outweighed by risk of

confusing or misleading the jury.  Dr. Parmet conceded that even if Bielstein

had disclosed his sinusitis and diphenhydramine use during his

examination for a medical certificate, the FAA would still likely have issued a

medical certificate, but based on the condition that he take non-sedating

medication.  Accordingly, Bielstein would still have been flying the plane on

the day of the accident.  And, the only effect of disclosure would have been

that Bielstein would not have had diphenhydramine in his system at the

time of the accident.  As discussed above, however, the evidence does not

establish that Bielstein was experiencing any sedative side effects of the

diphenhydramine in his tissues.  Accordingly, the evidence of Bielstein's

sinusitis and self-medication through diphenhydramine has minimal

probative value.  Further, determining whether Bielstein actually had

86

sinusitis and was self-medicated would result in a "collateral mini trial[ ]" on a minimally probative, tangential issue.  See United States v. Waloke, 962 F.2d 824, 830 (8th Cir. 1992).  Admitting this evidence also risks confusing or misleading the jury, particularly when an expert opines that these conditions contributed to the cause of the accident.

Based on the foregoing, the court finds that evidence of Bielstein's alleged chronic sinusitis and self-medication with diphenhydramine is inadmissible, and the plaintiffs' motion in limine (Docket 242) is granted.

**C.      Ethanol in Bielstein's Tissue**

Plaintiffs move to exclude evidence that the autopsy indicated Bielstein's tissue contained ethanol.  The undisputed evidence shows that Bielstein's body may have created this ethanol following his death.  Further, nothing indicates that Bielstein was either consuming alcohol or under the influence of alcohol at the time of the accident.  If this evidence is presented to the jury, there is a substantial risk that the jury would impermissibly infer that Bielstein had consumed alcoholic beverages.  Accordingly, plaintiffs' motion in limine is granted.  This evidence is inadmissible because its probative value is substantially outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury.  See Fed. R. Evid. 403.

**D.     NTSB Accident Report and NTSB Factual Report**

Plaintiffs move in limine to exclude the NTSB Accident Report, which

contains the NTSB's probable cause determination of the cause of the

accident.  Plaintiffs also move to exclude admission of the NTSB Factual

Report[18] that was created by the investigator of this accident.  The court

analyzes the NTSB Accident Report and the NTSB Factual Report separately.

See Chiron Corp. & PerSeptive Biosystems, Inc. v. Nat'l Transp. Safety Bd,

198 F.3d 935, 940 (D.C. Cir. 1999); see also Roy Tess Atwood, Admissibility

of National Transportation Safety Board Reports in Civil Air Crash Litigation,

53 J. Air L. & Com. 469,487-88 (1987) (noting that federal law treats the

NTSB Accident Report and the NTSB Factual Report differently for

admissibility purposes).

**1.     NTSB Accident Report**

Plaintiffs contend that federal law expressly prohibits admission of the

probable cause determination contained in the NTSB Accident Report.

Congress has explicitly limited the admissibility of NTSB reports in the civil

litigation: "No part of a report of the [NTSB], related to an accident or an

investigation of an accident, may be admitted into evidence or used in a civil

---

[18] For clarity, the NTSB Factual Report as used herein refers to the report
attached as exhibit A of plaintiffs' memorandum in support of its third motion
in limine (Docket 307).

88

action for damages resulting from a matter mentioned in the report."  49

U.S.C. § 1154(b).  And federal regulations governing the NTSB indicate that

§ 1154(b) applies to a Board accident report.  49 C.F.R. § 835.2.  Similarly,

the regulations define a Board accident report as "the report containing the

[NTSB's] determinations, including the probable cause of an accident, issued

either as a narrative report or in a computer format . . . ." Id.  Thus,

§ 1154(b) and the corresponding federal regulations prohibit the

admissibility of NTSB's probable cause determination.  Indeed, defendants

acknowledge that NTSB's probable cause determination is inadmissible in

this case.  Accordingly, plaintiffs' motion in limine is granted in part, and

evidence of the NTSB's probable cause determination is excluded.

This is a narrow ruling.  The court is not ruling on the admissibility of

other factual findings contained in the NTSB Accident Report,[19] because

defendants are apparently only intending to offer the NTSB Factual Report,

and not the NTSB Accident Report.

---

[19]  NTSB Accident Reports often contain extensive factual findings in a addition to the NTSB's conclusion, opinions, and probable cause determination.  The Eighth Circuit has not considered the matter of admissibility of these factual findings, and other federal courts are split. Compare Chiron Corp. & PerSeptive Biosystems, Inc. v. Nat'l Transp. Safety Bd., 198 F.3d 935, 940-41 (D.C. Cir. 1999), with Am. Airlines, Inc. v. United States, 418 F.2d 180, 196 (5th Cir. 1969).  The court refrains from determining this issue at this juncture.

### 2.    NTSB Factual Report

Plaintiffs also move to exclude the NTSB Factual Report at trial.

Unlike the NTSB Accident Report, the NTSB Factual Report is not subject to

§ 1154(b)'s prohibition on admissibility in a civil proceedings.  Federal

regulations explicitly state that the NTSB "does not object to, and there is no

statutory bar to, admission in litigation of factual accident reports."  18

C.F.R. § 835.2.  The regulations define a factual accident report as "the

report containing the results of the investigator's investigation of the

accident."  49 C.F.R. § 835.2.  Plaintiffs acknowledge that the NTSB Factual

Report in this case qualifies as a factual accident report, thereby implicitly

conceding that there is no general statutory bar to the admission of the

NTSB Factual Report in this case.  See Chiron Corp. & PerSeptive

Biosystems, 198 F.3d at 940 (stating that factual accident reports are

admissible).

Nevertheless, plaintiffs argue that the factual narrative contained

within the NTSB Factual Report is inadmissible hearsay.  Initially, the court

notes that admission of the NTSB Factual Report itself is not prohibited by

the hearsay rule.  Fed. R. Evid. 803(8)(C) states that the hearsay rule does

not exclude admission of government reports containing "factual findings

resulting from an investigation made pursuant to authority granted by law,

unless the sources of information or other circumstances indicate lack of

trustworthiness."  The party opposing admission has the burden of proving that the report lacks trustworthiness.  <u>Union Pac. R.R. v. Kirby Inland Marine, Inc. of Miss.</u>, 296 F.3d 671, 679 (8th Cir. 2002).

   The NTSB Factual Report here was created pursuant to the NTSB's statutory duty to investigate plane crashes, and thus, fits within this exception to the hearsay rule.  <u>See</u> <u>Major v. CSX Transp.</u>, 278 F. Supp. 2d 597, 604-05 (D. Md. 2003); <u>Budden v. United States</u>, 748 F. Supp. 1374, 1377 (D. Neb. 1990), <u>rev'd on other grounds</u> 963 F. 2d 188 (8th Cir. 1992). Plaintiffs have not carried their burden of proving that the NTSB Factual Report lacks trustworthiness.  <u>See</u> <u>Union Pac. R.R.</u>, 296 F.3d at 679. Accordingly, Rule 803(8)'s public records exception applies to the NTSB Factual Report in this case.

   This, however, does not terminate the court's hearsay analysis because portions of the report may present independent hearsay problems. <u>Budden</u>, 748 F. Supp. at 1377.  "Evidence reported in a government document is only admissible to the extent that the maker of the document could testify to that evidence were he or she present in court."  <u>Id.</u> Recitation of otherwise inadmissible hearsay evidence in a government document does not make that evidence admissible.  <u>See</u> <u>id.</u>

   Plaintiffs have objected to several specific portions of the NTSB Factual Report.  The court will discuss each of these objections in turn.

91

### a. Toxicology Report

Plaintiffs object to reference of the findings of the toxicology report in the NTSB Factual Report. As discussed above, the court found the evidence of ethanol and diphenhydramine in Bielstein's tissue inadmissible. This ruling applies to the NTSB Factual Report, and this evidence must be redacted.

### b. Teledyne Motor Engine Tear Down

During its investigation of the accident, the NTSB sent the accident aircraft's engines to Teledyne for tear down and analysis. Teledyne then submitted a report of its findings, concluding that both engines were operating properly and that the engines did not "exhibit any condition that would have caused an operational problem." (Docket 307-2, at 5). The NTSB investigator quoted these findings in the narrative portion of the NTSB Factual Report. Plaintiffs seek to exclude both Teledyne's report and the quotation of its findings.

The court finds that both Teledyne's report and the investigator's quotation of the report constitute inadmissible double hearsay if offered by the defendants in this case. See Fed. R. Evid. 805. The conclusions in Teledyne's tear down report indicating that the engines were operating properly are out-of-court statements offered to prove the truth of the matter asserted. See Fed. R. Evid. 801(c). Further, Teledyne's report does not fit in

92

the public record exception because it was produced by Teledyne rather than a "public office or agenc[y]."  See Fed. R. Evid. 803(c); see also John McShain, Inc. v. Cessna Aircraft Co., 563 F.2d 632, 636 (3d Cir. 1977) ("The Advisory Committee's Notes make clear that Federal Rule of Evidence 803(8) exempts from the hearsay rule only reports by officials; and of course the pilots and other witnesses are not officials for this purpose.").  In fact, Teledyne's tear down report is simply a prior, self-serving statement by a party, which when offered by that party, constitutes classic, inadmissible hearsay.  See United States v. Waters, 194 F.3d 926, 931 (8th Cir. 1999); see also Olson v. Ford Motor Co., 410 F. Supp. 2d 855, 861 (D.N.D. 2006).  And, because Teledyne's report is inadmissible, the NTSB investigator's quotation of that report is also inadmissible.  See Budden, 748 F. Supp. at 1378.

### c.      Honeywell's Turbocharger Tear Down Analysis

As part of the investigation, Honeywell tore down and analyzed both the turbochargers from the accident aircraft.  The NTSB Factual Report contains a copy of Honeywell's report, and the narrative portion of the NTSB Factual Report quotes Honeywell's findings.  Like the Teledyne report, both Honeywell's report and the NTSB's investigator's quotations from that report are inadmissible double hearsay.

93

### d.      NTSB Metallurgy Report of Left Wastegate Elbow

As part of the accident investigation, the NTSB Materials Laboratory Division analyzed the left wastegate elbow, finding a pre-accident crack of approximately one-half inch.  A laboratory report of the findings is included in the NTSB Factual Report.  (Docket 307-2, at 12).  This laboratory report fits within the public records exception to the hearsay rule, and thus, is admissible.  See Fed. R. Evid. 803(8).

Plaintiffs contend that the laboratory report is not admissible because it contains an impermissible opinion or conclusion, namely that the crack in the wastegate elbow was only one-half inch.  The Supreme Court, in Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 162, 109 S. Ct. 439, 446, 102 L. Ed. 2d 445 (1988), rejected this argument and held that factually based conclusions or opinions by a governmental agency performing an evaluative report qualify as factual findings admissible under Fed. R. Evid. 803(8).  Based on Rainey, the court finds that the laboratory report fits within the public records exception to the hearsay rule and that the conclusion regarding the size of the crack in the wastegate elbow is admissible.

### e.      Witness Statements

Finally, the NTSB Factual Report contains statements provided by several witnesses.  Additionally, the narrative either summarizes or quotes these witness statements.  These witness statements constitute hearsay,

94

and thus, must be redacted from the NTSB Factual Report and the narrative before being offered into evidence.  See Budden, 748 F. Supp. at 1378.

In conclusion, the NTSB Factual Report itself is admissible in the redacted form required by the foregoing discussion.  Plaintiffs' third motion in limine (Docket 306) is granted in part and denied in part. Additionally, this ruling is limited to the admissibility of the NTSB Factual Report.  This ruling does not prevent the parties from calling witnesses who actually performed the analysis to testify about their findings.  Nor does it prevent expert witnesses from relying on the foregoing in forming their opinion so long as the expert testimony complies with the requirements of Fed. R. Evid. 703.

**XI.    Motion to Strike Defendants' Designation of Plaintiffs' Experts**

In an attempt to comply with Fed. R. Civ. P. 26(a)(2)(A), defendants designated two experts retained by plaintiffs, Donald Sommer and Arthur "Lee" Coffman, (collectively referred to as plaintiffs' experts), as experts defendants expect to testify at trial.  Plaintiffs have moved to strike defendants' designation under Fed. R. Civ. P. 26 of plaintiffs' experts as their own experts.  Additionally, plaintiffs move in limine to prevent defendants from inquiring on cross-examination about plaintiffs' experts' opinion on whether either Capital City or RAM Corp were negligent and whether that negligence caused the accident.  Plaintiffs also move in limine to prevent

defendants from offering the expert reports, deposition testimony, or prior state trial testimony of Sommer and Coffman.

The court first considers plaintiffs' motions in limine. Plaintiffs are attempting to prevent defendants from cross-examining plaintiffs' experts on their opinions and prior testimony regarding Capital City and RAM Corp.

Plaintiffs apparently plan to call Sommer and Coffman to testify at trial. Plaintiffs designated both Sommer and Coffman as experts and disclosed their expert reports pursuant to Fed. R. Civ. P. 26. (Docket 291-2). Additionally, both plaintiffs' experts have been deposed in this matter. (Docket 257-4, at 9-15). Furthermore, by moving to limit cross-examination, plaintiffs implicitly acknowledge that they plan to call Sommer and Coffman.

As a general matter, if plaintiffs' experts testify at trial, then defendants could typically cross-examine them regarding their opinions on what caused the accident, including whether it was caused by the negligence of either Capital City or RAM Corp. Nevertheless, plaintiffs argue that the court should limit this line of inquiry under Federal Rule of Evidence 403.

Under Rule 403, evidence is inadmissible if its "probative value is substantially outweighed by the risk of unfair prejudice, confusion of the issues, or misleading the jury . . . ." This balancing test requires the court to "consider 'the degree of unfairness of the prejudicial evidence and whether

it tends to support a decision on an improper basis.'" <u>United States v.</u>
<u>Cawthorn</u>, 429 F.3d 793, 801 (8th Cir. 2005) (quoting <u>United States v. Noe</u>,
411 F.3d 878, 887 (8th Cir. 2005)). "Generally, the balance of Rule 403
weighing should be struck in favor of admission." <u>Smith v. Tenet</u>
<u>Healthsystem SL, Inc.</u>, 436 F.3d 879, 885 (8th Cir. 2006).

Here, the court finds the opinions of both Sommer and Coffman,
including previous testimony, highly probative. This evidence goes directly
to a question of fact at issue in this case–whether defendants' alleged
negligence proximately caused the accident. <u>See, e.g.</u>, <u>Wuest ex. rel. Carver</u>,
619 N.W.2d at 689 (S.D. 2000) (stating causation is a question of fact for the
jury).

Additionally, defendants should be able to expose any change or
inconsistency between plaintiffs' experts' testimony at this trial with their
previous testimony at the state trial, because this evidence is highly
probative of plaintiffs' experts' credibility. <u>See</u> Fed. R. Evid. 611(b), 801(d).
This is particularly important in this highly technical and complicated case.
Questions of negligence and causation will likely be heavily influenced by
competing expert testimony. Accordingly, the court refuses to withhold from
the jury valuable evidence of the credibility of plaintiffs' experts.

Further, this evidence is relevant to defendants' action for
contribution. Defendants have filed a cross-claim against RAM Corp and a

97

third-party claim against Capital City in an effort to obtain contribution pursuant to South Dakota's Uniform Contribution Among Tort-Feasors Act. SDCL 15-5-12 states that "when there is such a disproportion of fault among joint tort-feasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative fault of the joint tort-feasors shall be considered in determining their pro rata shares." The trier of fact determines the relative level of fault of each joint tort-feasor. SDCL 15-8-15.2.  Additionally, when a previous joint tort-feasor has settled with the plaintiff, the settlement reduces plaintiffs' recovery from the remaining defendants by the amount of the consideration paid for the release.  See SDCL 15-8-17.  If, however, the remaining defendants file either a cross-claim or a third-party claim to litigate the proportionate fault of the settling defendant, then the plaintiffs' recovery from the remaining defendants is reduced by the greater amount of the consideration paid for the release or the settling defendant's proportionate level of fault as determined by the trier of fact.  See Carr v. Korkow Rodeos, 788 F.2d 485, 489-90 (8th Cir. 1986) (applying South Dakota law).

Here, defendants have filed cross-claims and third-party claims and are seeking a jury determination of the relative levels of fault by both Capital City and RAM Corp for contribution purposes.  Plaintiffs' experts' opinions regarding whether Capital City or RAM Corp were negligent, and whether

that negligence proximately caused the accident is highly probative and will aid the jury in determining the respective level fault attributable to all parties involved.

Plaintiffs acknowledge that Sommer and Coffman both testified at the state trial that Capital City's negligent maintenance caused the accident. Plaintiffs argue, however, that this evidence is unfairly prejudicial because the state court allegedly limited the scope of plaintiffs' experts' testimony to whether Capital City, the only defendant in the state trial, actually caused the accident. Accordingly, plaintiffs argue that the experts' state trial testimony did not reflect the other allegedly negligent acts by Cessna and FlightSafety that also proximately caused the accident. Accordingly, plaintiffs argue that permitting cross-examination of plaintiffs' experts about their previous state trial will mislead and confuse the jury. Plaintiffs also contend that they can only ameliorate this confusion by explaining the state trial judge's ruling. Plaintiffs claim this would unfairly prejudice them, because, as a practical matter, it requires disclosing the prior state trial and its ultimate settlement to the jury. And thus, the jury may not award a fair judgment in light of the previous recovery. Additionally, they contend disclosure here will deter settlement in future cases.

Though plaintiffs may experience some unfair prejudice, the court finds that this prejudice does not substantially outweigh the highly

99

probative value of this evidence.  First, the court notes that plaintiffs, who chose to simultaneously litigate in federal and state court, contributed to any prejudice they experience.  Additionally, the court is reluctant to limit the scope of cross-examination on an issue directly affecting a testifying witnesses's credibility, such as prior inconsistent testimony, because it impedes the trial's truth-seeking function and hampers the jury's evaluation of a witness's credibility.  Cf. United States v. Harris, 956 F.2d 177, 181 (8th Cir. 1992).  Finally, as noted above, this evidence goes directly to issues in dispute in this case.  Accordingly, under the Rule 403 balancing test, the court finds that defendants can cross-examine plaintiffs' experts regarding their opinion on whether Capital City and RAM Corp were negligent, whether that negligence proximately caused the accident, and on the experts' previous testimony during the state trial.

Additionally, plaintiffs argue that plaintiffs' experts' previous testimony is hearsay.  First, the court notes that the experts have been deposed, and thus, defendants can use that deposition without violating the hearsay rule so long as the criteria contained in Fed. R. Civ. P.  32(a)(3) are satisfied.  Additionally, as for the prior state trial testimony, this is not hearsay and thus is admissible if the experts testify inconsistent with their state trial testimony.  See Fed. R. Evid. 801(d)(1).  The court cannot determine at this time whether either of the foregoing is satisfied, and

thus, plaintiffs' hearsay objection is premature.  If plaintiffs think a hearsay objection is appropriate, then they should raise that objection at trial.

Plaintiffs also urge the court to bifurcate the trial pursuant to Fed. R. Civ. P. 42(b).  Plaintiffs contend that the court can avoid the unfair prejudice by having on trial on defendants' liability first, during which all evidence relating to the fault of Capital City and RAM Corp would be prohibited. Then, afterwards, the court would hold a second separate trial during which the contribution claims would be litigated.

Pursuant to Rule 42(b), the court "to avoid prejudice . . . may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim . . . ."  The court has broad discretion regarding whether to bifurcate a trial. See Rolscreen Co. v. Pella Prods. of St. Louis, Inc., 64 F.3d 1202, 1209 (8th Cir. 1995).  Bifurcation of the trial is only appropriate, however, when it serves the purposes contained in Rule 42(b), such as preventing unfair prejudice.  See 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2388 (2d ed. 1994).

Here, the court denies the request to bifurcate the trial because it will not prevent unfair prejudice.  As noted above, cross-examination of the experts is highly probative on the matter of defendants' liability, because it goes directly to the issues of causation as well as the credibility of plaintiffs' experts.  The court finds that this evidence would be admissible in both the

101

liability phase of the trial and the contribution phase. Accordingly, there is no advantage to separating the trial on these issues and plaintiffs' request is denied.

Finally, plaintiffs move to strike the defendants' designation of plaintiffs' experts, and to prevent defendants from calling either Sommer and Coffman. There is a marked split in authority on when and if a party can call another party's expert. See generally House v. Combined Ins. Co. of Am., 168 F.R.D. 236 (N.D. Iowa 1996) (describing split in authority). At this juncture in the case, the court refrains from deciding whether defendants can call plaintiffs' experts, because if plaintiffs call the experts, then the defendants should be able to elicit any evidence they seek through cross-examination. This will effectively moot defendants' need to call plaintiffs' experts. Accordingly, a decision on this issue will likely amount to an impermissible advisory opinion, and plaintiffs' motion to strike is premature. Cf. St. Louis Fire Fighters Ass'n Int'l Ass'n of Fire Fighters Local 73 v. City of St. Louis, Mo, 96 F.3d 323, 329 (8th Cir. 1996) (stating court should not decide abstract matters of law that have become moot). If, however, plaintiffs do not call either Sommer or Coffman at trial, and defendants intend to call them, then plaintiffs can reassert their objection.

In conclusion, plaintiffs' motion to strike expert designation and preclude elicitation of evidence implicating fault of settling defendants (Docket 256) is denied.

Based on the foregoing, it is hereby

IT IS FURTHER ORDERED that defendant Cessna's motion for summary judgment based on GARA (Docket 236) is denied.

IT IS FURTHER ORDERED that defendant Teledyne's motion for summary judgment based on GARA (Docket 261) is granted.

IT IS FURTHER ORDERED that defendant Textron's motion for summary judgment (Docket 249) is granted.

IT IS FURTHER ORDERED that defendant Teledyne's motion for summary judgment (Docket 264) and motion for summary judgment (Docket 267) are denied as moot.

IT IS FURTHER ORDERED that plaintiffs' motion to compel production of documents from Teledyne (Docket 258) is denied as moot.

IT IS FURTHER ORDERED that FlightSafety's motion to dismiss for lack of personal jurisdiction (Docket 274) is denied.

IT IS FURTHER OREDERD that FlightSafety's motion for summary judgment (Docket 272) is granted in part and denied in part as described herein.

IT IS FURTHER ORDERED that defendant Cessna's motion for partial summary judgment (Docket 243) is granted.

IT IS FURTHER ORDERED that Cessna's first motion in limine (Docket 295) is granted.

IT IS FURTHER ORDERED that FlightSafety's motion to exclude the trial testimony of Donald Sommer (Docket 270) and FlightSafety's motion to strike the affidavit of Donald Sommer (Docket 429) are denied.

IT IS FURTHER ORDERED that plaintiffs' first motion in limine (Docket 242) is granted.

IT IS FURTHER ORDERED that plaintiffs' second motion in limine (Docket 256) is denied.

IT IS FURTHER ORDERED that plaintiffs' third motion in limine (Docket 306) is granted in part and denied in part as described herein.

IT IS FURTHER ORDERED that plaintiffs' motion to strike the affidavit of Mark Marshall (Docket 337) is denied as moot.

Dated April 20, 2006.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE


104